No. 04-0035C
(Judge Hodges)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CANAL ELECTRIC COMPANY
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

# CANAL ELECTRIC COMPANY'S RESPONSE TO THE COURT'S FEBRUARY 3, 2005 ORDER

---

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

*Counsel of Record for*
*Canal Electric Company*

Of Counsel:
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037

Timothy N. Cronin
Assistant General Counsel
NSTAR Electric & Gas
Corporation
800 Boylston Street
Mail Stop P1701
Boston, MA 02199-0228

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

**(1) Plaintiff claims a taking for the dminished value of its property. That is, the purchaser paid a discounted value for plaintiff's property because of Defendant's breach. We ask that plaintiff identify and describe the property right Claimed to have been taken** ........ 2

**(2) Typically, the United States receives property when it pays just compensation – for example, an easement. What would the Government receive in this case? Explain the nature of the taking alleged. Physical? Regulatory? Temporary? Permanent? Inverse? Categorical? Include the basis for such allegations. For example, if plaintiff alleges a regulatory taking, identify the applicable regulation. If plaintiff alleges a physical taking, describe the invasion alleged.** ........ 6

a. By Requiring Canal to Provide for Interim Storage of SNF at the Seabrook Site, the Government Effectively Acquired an Easement/ Constructive Easement in the Property for That Purpose ........ 6

b. The Nature of the Government's Taking ........ 8

(1) The Physical Taking of Canal's Real Property ........ 9

(2) The Regulatory Taking of Canal's Property ........ 13

**(3) Is this a novel takings theory? If not, cite cases that claim takings for a diminished value of property because of a breach of contract** ........ 17

**(4) Plaintiff limits its takings claim to the diminished value of its property.See Tr. at 28 (Jan. 13, 2005). We understand plaintiff's claim to be that factors such as the payment of fees, storage of SNF, and uncertainty about the future of Seabrook contributed to the diminution of plaintiff's property value. Such factors discussed at the hearing were not alternative takings theories or damage theories. See, e.g., Tr. at 35** ........ 18

**(5) Plaintiff's claim seems to be that defendant's breach of contract created or resulted in the taking. Takings generally may not result from improper or tortious conduct by the United States. Cite case law to support plaintiff's argument that a breach of contract can give rise to a taking** ........ 19

**(6) Plaintiff assigned or transferred its contract rights to FPL Energy Seabrook, according to defendant. Canal has filed a "protective" claim for breach of contract, apparently because a challenge to such transfers is pending. What would be the effect of a successful challenge to plaintiff's assignment of its contract claim? Would plaintiff proceed on a breach claim alone? When will this issue be decided?** ........ 20

**(7) Plaintiff claims standing as a third-party beneficiary. Defendant argues that plaintiff was not an intended beneficiary of the contract. If Canal is a third-party beneficiary, does this resolve the issue of whether it has standing as a minority owner? Plaintiff argues that its position may be distinguished from that of a shareholder by the fact that it had management duties. What was the nature of its management duties? Does defendant acknowledge that management duties properly distinguish Canal's position here from that of a shareholder with regard to standing?** ........ 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996) .......... 13

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973) .......... 4

*Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) .......... *passim*

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .......... 3, 16, 17, 18

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990) .......... 9, 12, 18

*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) .......... 3, 17, 21, 23

*E. Enterprises v. Apfel*, 524 U.S. 498 (1998) .......... 9

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999) .......... 24

*Glosmeyer v. United States*, 45 Fed. Cl. 771 (2000) .......... 6

*Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005) .......... *passim*

*Ind. Mich. Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... 13

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .......... 3, 12, 18, 24

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......... *passim*

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 3, 11, 17, 24

*Maine Yankee v. United States*, 225 F.3d 1336 (Fed Cir. 2000) .......... 21

*Penn Central Transport Co. v. New York City*, 438 U.S. 104 (1978) .......... 13

*Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002) .......... 24

*Sacramento Municipal Utility District v. United States*, 61 Fed. Cl. 438 (2004) .......... *passim*

*United States v. Peewee Coal Co.*, 341 U.S. 114 (1951) .......... 3, 12, 18, 24

*Vaizburd v. United States*, 384 F.3d 1278 (Fed. Cir. 2004) .......... 6

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) .......... 12, 18

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .................................... 9

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1991) ................................................. *passim*

**DOCKETED CASES**

*Atlantic Electric Co. v. United States*, No. 04-0036C ................................................. 8, 9, 17, 23

*Boston Edison v. United States*, No. 99-447C (Fed. Cl. Feb 15, 2005) ............................. *passim*

*Delmarva Power & Light Co. v. United States*, No. 04-0034C .................................... 8, 9, 17, 23

*Entergy Nuclear Generating Co. v. United States*, No. 03-2626C, at 2
(Fed. Cl. filed Nov. 4, 2004) ........................................................................................ 20

*Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C, (Feb 9, 2005) ............. 21

**FEDERAL STATUTES**

42 U.S.C. § 10131(a)(4) ........................................................................................................ 8

42 U.S.C. § 10222(a)(5) ............................................................................................... 6, 9, 10

Federal Register Final Rule, 48 Fed. Reg. 16590-01, at 16590-01 (April 18, 1983) ............. 22

Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 92-425, 96 Stat. 2202
(Jan. 7, 1983) ................................................................................................................... 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CANAL ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-0035C<br>(Judge Hodges) |

**CANAL ELECTRIC COMPANY'S RESPONSE**
**<u>TO THE COURT'S FEBRUARY 3, 2005 ORDER</u>**

Pursuant to the Court's Order dated February 3, 2005, Canal Electric Company ("Canal"), through its undersigned counsel, hereby responds to the questions posed by the Court therein.

As described in greater detail below and as articulated fully in Canal's Complaint, First Amended Complaint, Response to the Government's Motion to Dismiss, and the hearing thereon, Canal alleges both physical and regulatory takings claims arising from the Government's failure to begin accepting Canal's Spent Nuclear Fuel and high-level radioactive waste ("SNF") on or before January 31, 1998, as expressly required by the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (Jan. 7, 1983). The Government's failure to create a permanent repository for SNF storage as required by Congress had a detrimental impact on the entire nuclear industry, including the Seabrook nuclear power plant ("Seabrook"), by indefinitely forestalling SNF disposal, which in turn created significant long-term costs and obligations for individual utilities. As a direct consequence of the Government's failure to accept Seabrook's SNF as required by Congress, Canal was deprived of three distinct, yet interrelated, property interests: its real property interest, the assets

associated with its real property, and the going-concern value of the Seabrook facility. As described more fully *infra*, these property interests, and the just compensation owing as a result thereof, have been recognized by numerous SNF decisions of this Court and are consistent with well-settled takings jurisprudence. Moreover, Canal's takings claims arise from the NWPA and its progeny, *not* from claims arising from the Standard Contract. Finally, as an owner of Seabrook, Canal is entitled to just compensation for that portion of Canal's property interest that was taken.

The following sets forth the questions posed by the Court's February 3, 2005 Order and Canal's response thereto:

**(1) Plaintiff claims a taking for the diminished value of its property. That is, the purchaser paid a discounted value for plaintiff's property because of defendant's breach. We ask that plaintiff identify and describe the property right claimed to have been taken.**

Three related property interests were taken from Canal by the Government's failure to remove SNF from Seabrook on or before January 31, 1998: (1) Canal's real property interest, namely, the property that must be employed to provide storage of the SNF for which the Government was otherwise responsible, (see e.g., First Amended Complaint ¶ 89); (2) Canal's assets associated with Seabrook, (see *id.* ¶¶ 7, 87, 89); and (3) the value of the Seabrook facility as a going concern, i.e., the ability of Canal to use and enjoy the benefit from the Seabrook facility unencumbered by the mounting liabilities associated with interim SNF storage, and the costs and uncertainties of permanent disposal, (see *id.* ¶¶ 71-75, 89).

The property interests described above have been recognized by the Court of Federal Claims in parallel SNF proceedings and are consistent with well-settled takings

case law. *See Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438, 442 (2004) ("*SMUD*") (nuclear utility has recognized property interest in both the Standard Contract and its ability to put its real property to "other valuable economic uses"); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) (analyzing nuclear utility's real property interests taken by the Government); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (apartment building owners had property interest in the full use of their building that could not be taken without just compensation); *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979) (plaintiff had property interest in real property – a private pond – that was taken when the Government imposed a navigational servitude); *United States v. Peewee Coal Co.*, 341 U.S. 114 (1951) (property interest in coal mine and associated property); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 14 (1949) (taking of laundry's premises as well as its "opportunity to profit from its trade routes," i.e., its going-concern value); *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) (real estate owners had vested property interests in the contractual right to prepay and exit low-income housing programs); *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) (turkey breeders had property interest in the "economically viable use of property" – i.e., turkeys for breeding stock as opposed to slaughter); *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005) (security company had property interest in its business assets, "including its contracts, goodwill, and going-concern value"); *Benenson v. United States*, 548 F.2d 939, 949 (Ct. Cl. 1977) (hotel owner's fee interest in the use of its hotel was cognizable property interest).[1]

Canal is not claiming that "the diminished value of the property" constitutes its protected property right in this matter. Diminished value is the means of measuring

---

[1] These cases are analyzed in depth *infra* in response to the Court's second question regarding Canal's takings theories.

the quantum of the just compensation owed to Canal because of the Government's taking of the property rights identified *supra*. A diminished value approach to just compensation is measured by the difference between the fair market value of Seabrook before and after the taking, in other words, the diminished value of Seabrook. Canal has properly alleged that it is entitled to receive the diminished value of its property as just compensation for the Government's unlawful taking. Once a taking has been established, the courts have interpreted just compensation as the difference between the fair market value of the affected property before and immediately after the date of the taking. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973). The Federal Circuit, in *Yancey*, has concurred in this finding, and has held that when a property interest has not been completely destroyed, takings damages are awarded by calculating the amount by which the property's value was diminished. 915 F.2d at 1541.

A diminished value approach to calculating the quantum of just compensation for a taking of property is also consistent with the approach employed by the Supreme Court in *Kimball Laundry*. In *Kimball Laundry*, the Court found the impact of the Government's actions on the value of the plaintiff's business to be a sufficient means of calculating just compensation because the Government's actions had the effect of diminishing the going-concern value of the plaintiff's business. 338 U.S. at 14. The Court found that the going concern of a business has a "value to a potential purchaser no different from the value of the business's physical property." *Id.* at 11; *see also Huntleigh*, 63 Fed. Cl. at 445 (denying the Government's motion to dismiss the plaintiff's takings claim for the diminished value of its assets).

The takings decisions cited above are consistent with Judge Lettow's recent opinion in *Boston Edison Co. v. United States*, No. 99-447C (Fed. Cl. Feb. 15, 2005), a copy

of which is attached hereto as Exhibit 1, where he affirmed diminished value as a means of calculating losses for the Government's failure to begin disposal of SNF on or before January 31, 1998. In denying the Government's motion to dismiss on all counts (including the plaintiff's takings claim), Judge Lettow found:

> In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution in value is left as the appropriate damage assessment. . . . That damages might arise from diminution in value was foreseeable. . . . In short, Boston Edison's diminution-in-value claim alleges adequate injury in fact for purposes of standing.

Slip op. at 19 -20.[2]

Similar to the plaintiffs in *Yancey, Kimball Laundry, Huntleigh,* and *Boston Edison,* the Government's failure to remove SNF from Seabrook lowered the going-concern value of Seabrook, as measured by the diminished amount the purchaser was willing to pay for Seabrook. The Government's failure to accept Seabrook's SNF had numerous impacts on Canal, including, but not limited to: forcing Canal to maintain financial responsibility for SNF, encumbering Seabrook with interim storage obligations for SNF, depriving Canal of both the fair use and enjoyment of its ownership interest in Seabrook, Canal's overpayment of fees to the Nuclear Waste Fund, the continued/ongoing obligation to pay fees through approximately 2020, future expenses associated with interim storage of SNF, decommissioning costs, and the impact of interim storage on the long-term viability of Seabrook.

[2] Canal recognizes that Judge Lettow's comments were made in the context of damages for a breach of contract. Nevertheless, the *Boston Edison* analysis is no less instructive and helpful in calculating the quantum of the just compensation due to Canal.

**(2) Typically, the United States receives property when it pays just compensation – for example, an easement. What would the Government receive in this case? Explain the nature of the taking alleged. Physical? Regulatory? Temporary? Permanent? Inverse? Categorical? Include the basis for such allegations. For example, if plaintiff alleges a regulatory taking, identify the applicable regulation. If plaintiff alleges a physical taking, describe the invasion alleged.**

**a. By Requiring Canal to Provide for Interim Storage of SNF at Seabrook, the Government Effectively Acquired an Easement/Constructive Easement in the Property for That Purpose**

The Government has acquired an easement/constructive easement to use Seabrook as an interim storage facility for an indefinite period of time in lieu of siting, constructing and operating a federal SNF repository on or before January 31, 1998, as mandated by the NWPA. 42 U.S.C. § 10222(a)(5)(B).[3] Additionally, the Government received millions of dollars in fee payments from Canal, for which Canal received no benefit. On February 7, 2005, Margaret Chu, director of DOE's Office of Civilian Radioactive Waste, told reporters that DOE would not file a license application for such

[3] Through its failure to begin disposal of SNF on or before January 31, 1998, the Government acquired an easement/constructive easement upon Canal's property, forcing Canal to store SNF at the Seabrook facility until a federal repository was complete. To be sure, the Government need not receive anything in return for just compensation in response to a regulatory takings claim. *See Yancey*, 915 F.2d 1534 (finding the quarantine of the plaintiffs' turkeys was an unlawful regulatory taking even though the Government did not receive any property in return). Yet in the present case, the Government received an easement/constructive easement from Canal and the other owners of Seabrook. The easement taken in the present case is consistent with existing Court of Federal Claims jurisprudence. *See Vaizburd v. United States*, 384 F.3d 1278 (Fed. Cir. 2004) (holding that the inadvertent imposition of sand on the plaintiff's property that occurred as a result of a Government beach reclamation project was a de facto easement, and the Government was forced to compensate the plaintiff for the unlawful taking); *see also Glosmeyer v. United States*, 45 Fed. Cl. 771 (2000) (finding that the preservation of private property for possible future railroad activity constituted a taking of an easement).

a federal repository until the end of 2005. Ms. Chu further reported that "we're [DOE] hoping 2012" will be the year that a permanent repository begins accepting nuclear waste. *Repository Opening No Sooner Than 2012, DOE Official Says*, GREENWIRE (E&E Publishing, LLC, Washington, D.C.), Feb. 7, 2005. Despite the Government's recalcitrance, the owners of Seabrook were forced to make immediate accommodations for the interim storage of such waste in the absence of a permanent federal repository capable of accepting SNF on or before January 31, 1998. The extent of the Government's failure to provide such a facility means that future owners' interests in Seabrook (including the utility that purchased Canal's interest in Seabrook) will be encumbered by this easement.

When the Government failed to provide a permanent SNF repository on or before January 31, 1998, it also forced nuclear utilities, including Canal, to expend their own resources to plan for the disposal of SNF. Since Canal was unable to have its SNF reprocessed, it was left with two options: (1) to spend additional money to store Seabrook's SNF at an off-site storage facility, and/or (2) to provide for the storage of SNF at Seabrook. Transporting the waste off-site was not, nor is it now, a viable option because there are currently no private fuel storage facilities available to accept the waste.[4] Moreover, the NWPA charges the Government with the sole responsibility for

---

[4] As Judge Lettow held in *Boston Edison*:

> In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution of value is left as the appropriate damage assessment.

Slip op. at 19.

permanent SNF storage. 42 U.S.C. § 10131(a)(4). Thus, Canal was (and the subsequent purchaser still is) left to store the SNF at Seabrook. This condition severely restricted Canal's fair use and enjoyment of Seabrook.

**b. The Nature of the Government's Taking**

Canal has asserted both a physical and a regulatory taking of the property interests in Seabrook described *supra.* First, the Government's failure to begin removal of SNF on or before January 31, 1998 constituted a taking of Canal's land itself, forcing Canal to use identifiable portions of Seabrook as an indefinite storage facility for SNF. Since these portions of Seabrook cannot be used for any commercial purposes other than the interim storage of SNF in a manner dictated by the Government, Canal has been deprived of the fair use and enjoyment of its physical property.

The Government's actions also amounted to a regulatory taking of Canal's property interests as a direct result of the Government's failure to abide by its obligations under the NWPA. By obligating Canal to use Seabrook as an interim SNF storage facility, the Government deprived Canal of its investment-backed expectations in Seabrook, including the expectation that the owners of Seabrook (including Canal) would not otherwise be required to store SNF at the Seabrook facility. Since Canal was forced to sell its interest in Seabrook, the Government's taking was permanent.

The Court of Federal Claims has already found, in two separate but nearly identical cases, that property rights indistinguishable from those articulated by Canal could not be taken without just compensation pursuant to the Fifth Amendment and relevant takings case law. The Government filed a substantially similar motion to dismiss as the one presently pending in this matter, in *Delmarva Power & Light Co. v. United States*, No. 04-0034C ("*Delmarva*"), and *Atlantic Electric Co. v. United States*, No.

04-0036C ("*Atlantic*"). On December 3, 2004, Judge Christine Miller summarily denied the Government's Motion to Dismiss in *Delmarva*. A copy of Judge C. Miller's Order is attached hereto as Exhibit 2. Shortly thereafter, on January 11, 2005, Judge George Miller also denied the Government's Motion to Dismiss in *Atlantic* and transferred the case to Judge Christine Miller. A copy of Judge G. Miller's Order is attached hereto as Exhibit 3. Both the *Delmarva* and *Atlantic* decisions underscore the very legal arguments being adduced by Canal in the present case and described in greater detail *infra*.[5]

**(1) The Physical Taking of Canal's Real Property**

The Government's failure to remove SNF on or before January 31, 1998 as required by the NWPA infringed upon Canal's fair use and enjoyment of Seabrook resulting in the physical taking of Canal's real property. *See* 42 U.S.C. § 10222(a)(5)(B). The Government's failure to remove SNF, thereby requiring Canal to take steps necessary for the interim storage of SNF at Seabrook, amounted to a confiscation of Canal's physical property.

This takings theory was previously adopted in parallel SNF proceedings by Judge Braden in the *SMUD* decision referenced *supra*. In *SMUD*, Judge Braden found that the Government's failure to remove SNF amounted to a taking of the plaintiff's real property because the plaintiff was forced to utilize portions of its property to store SNF

[5] Takings claims like Canal's are inherently fact-based and not suited for summary disposition. *See E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990); *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985). The Government has failed to articulate a legal basis for precluding Canal's takings claim. Indeed, Canal's takings claim is premised upon property interests and supporting facts that have been previously recognized and endorsed by this Court as grounds from which to advance a Fifth Amendment cause of action. Moreover, Canal intends to adduce additional facts during discovery in support of its claim. As such, Canal respectfully asserts that the Court should deny the Government's Motion to Dismiss and allow Canal to proceed with the development of its case.

that the Government was otherwise obligated to take custody of no later than January 31, 1998 pursuant to the express obligations of the NWPA. 61 Fed. Cl. at 442-43; *see also* 42 U.S.C. § 10222(a)(5)(B). The Court agreed with the plaintiff's position that the Government's failure to begin removal of SNF on January 31, 1998 resulted in a physical taking and "forced SMUD to devote economically valuable real property to the storage of SNF." *SMUD*, 61 Fed. Cl. at 442 (internal quotation marks and citation omitted). In denying the Government's Motion to Dismiss, the Court found that the plaintiff had properly alleged that "[t]he government has taken this real property by denying SMUD its rights as owner of this property to put it (the portion of the property SMUD was obligated to designate for interim SNF storage) to other valuable economic uses." *Id.* (internal quotations marks and citation omitted). As in *SMUD*, Canal's physical takings claim seeks just compensation for the Government's de facto physical invasion of Seabrook.

Canal's physical takings claim is *identical* to the claim explicitly recognized by the Court in *SMUD*. As in *SMUD*, the Government has denied Canal the opportunity to put identifiable portions of Seabrook to other viable economic uses by forcing Canal (and other current and future owners of Seabrook) to preserve such property in order to store ever-increasing amounts of SNF for an indefinite period of time at Seabrook. The Government's failure to take custody of Seabrook's SNF required Canal to take the requisite steps necessary to accommodate the storage of SNF at Seabrook, a function that the NWPA unambiguously imposed upon the Government. In particular, the owners of Seabrook – including Canal – were obligated to plan for, designate, and reserve certain identifiable portions of the Seabrook facility for use as an interim storage facility. No other options for the handling of SNF were afforded to Canal. As such, the

Government's failure to accept Seabrook's SNF was akin to a confiscation of the portion of Seabrook that now must be used for interim SNF storage.

Judge Braden's *SMUD* decision is consistent with and supported by a fully developed body of takings jurisprudence. It is well settled that a Government-caused occupation of real property for public use constitutes a *per se* physical taking. *See Loretto*, 458 U.S. at 433 (law allowing cable companies to attach equipment to apartment buildings requires just compensation). Likewise, a Government action that results in the use of private property for a public purpose also constitutes a physical taking. *See, e.g., Benenson*, 548 F.2d at 949 (Ct. Cl. 1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest). The Government's failure to remove SNF from Seabrook, thereby requiring Canal to set aside commercially valuable property in order to store SNF on site, constitutes a similar physical occupation of Canal's real property by unlawfully depriving Canal of the fair use and enjoyment of Seabrook that must be used for the interim storage of SNF.

Canal was compelled to dedicate its property to activities and purposes that were specifically assigned by Congress to the Government in furtherance of the public interest for a safe and secure permanent repository for SNF. As the Court explained in finding a taking in *Benenson*, "[t]he net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose . . . . Consequently, plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility." *Id.* at 947. Similar to the situation in *Benenson*, where the Government refused to allow landowners to

remove a building from their property while simultaneously refusing to condemn the property, Canal was deprived of a federal repository for the storage of its SNF – a repository for which it paid millions of dollars in fees – and obligated by the Government to set aside otherwise commercially valuable property in order to store SNF at Seabrook in accordance with exacting federal standards.

A physical taking also occurs when the Government forces a business to dedicate its own property for the benefit of the public, or to perform activities and provide services that should be undertaken by the Government. *See, e.g., Kaiser Aetna,* 444 U.S. at 180 (taking occurred where Government imposed navigational servitude on landowner's "private pond"); *Peewee Coal Co.,* 341 U.S. 114 (taking occurred where Government federalized coal mine); *Kimball Laundry,* 338 U.S. at 6 (taking occurred where Government federalized laundry service and conscripted the owner's management and employees to operate plant). Similarly, when the Government has forced storage on another's private property, an illegal physical taking has occurred and the property owner must be justly compensated for its loss. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160 (1980) (a state may not transform private property into public property without just compensation); *see also Del Monte Dunes,* 920 F.2d 1496 (Government's refusal to allow private party to develop its land for use benefiting the public is an unlawful taking). The Government's failure to comply with its statutory duty to remove Canal's SNF, thereby obligating Canal to continue custodial responsibilities on its own property indefinitely, had an immediate and direct impact on Canal's fair use and enjoyment of Seabrook.

Indeed, the Government does not quarrel with Canal's assertion that the NWPA imposed an unconditional obligation on the Government to remove and dispose

of nuclear utilities' SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (citing 42 U.S.C. § 10222(a)(5)(B)). The Government's failure to remove and dispose of SNF in express disregard of the NWPA, requiring instead that Canal provide its own property and facilities to store SNF beyond the date when the Government was required to assume such obligations, constitutes a taking of Canal's physical property without just compensation.

**(2) The Regulatory Taking of Canal's Property**

The Government's failure to remove SNF from Seabrook on or before January 31, 1998 also amounted to a regulatory taking of Canal's property. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (holding that a determination of a regulatory taking of property is based upon: (1) the character of the Government's action; (2) the economic impact on the plaintiff; and (3) the extent to which the regulation interferes with distinct investment-backed expectations of the owner). As with Canal's physical takings allegations, a regulatory taking of Canal's property interests has been recognized in other SNF cases as arising exclusively from the NWPA and is consistent with well-settled takings jurisprudence.[6]

[6] Consistent with Canal's regulatory taking claim, the Government was also obligated to stop collecting fees from Canal once it failed to begin removal of SNF on or before January 31, 1998. The continued collection of Nuclear Waste Fund fees represents a classic illegal exaction claim under *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996), and its progeny. In *Aerolineas Argentinas*, the Federal Circuit held that "an illegal exaction has occurred when 'the Government has the citizen's money in its pocket.'" *Id.* at 1573, (quoting *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954)). *Aerolineas Argentinas* also establishes that "[a contract] does not provide the authorization for requiring the airlines to incur the obligations imposed on [the Government] by the enactment of [a statute]." *Id.* at 1576. The Federal Circuit's *Aerolineas Argentinas* decision thereby supports Canal's claim that the Government's continued imposition of the 1 mil per kWh fee constitutes a further taking of Canal's property without just compensation.

In a decision issued just two weeks ago by Judge Lettow, referred to above, Judge Lettow recognized the legal basis for takings claims emanating from the long line of Congressional involvement in SNF storage, culminating in the NWPA. In *Boston Edison*, Judge Lettow recognized that Boston Edison's takings claim does not arise from the Standard Contract, denying the precise argument that the Government is making in this case. Slip op. at 25, n. 22.. In rejecting the Government's restrictive view of a nuclear utility's rights, the Court held, "[a]s a matter of logic, that [the] NWPA may have altered a pre-existing right of Boston Edison does not mean that the right taken was created solely by the Standard Contract." *Id.* Indeed, the Government has historically recognized its obligation to provide for the permanent storage of SNF. Government actions toward this end began in 1954 with the passage of the Atomic Energy Act, and have continued up to and included the passage of the NWPA in 1983. Consequently, electric utilities (including Canal) designed, and the Atomic Energy Commission licensed and approved for operation, nuclear power facilities with limited SNF wet storage pool capacity, which were designed only for temporary storage and for only a fraction of a nuclear plant's forty-year license life. In short, these utilities invested in their facilities with the expectation that the Government would fulfill its long-standing obligation to accommodate the storage of SNF. The Court's *Boston Edison* decision recognizes that nuclear utilities, such as Canal, had reasonable investment-backed expectations in their facilities that did not include the interim storage of SNF. *Id.*

As in *Boston Edison*, Canal's property interests in its property, assets, and going-concern value – for which Canal had reasonable investment-backed expectations (as manifested in the design and construction of Seabrook) – were taken as a result of

the Government's failure to remove SNF from Seabrook on or before January 31, 1998. In fact, Canal was an original participant from approximately 1982 forward in the siting, development, design, and construction of Seabrook with the understanding that it would be able to adequately dispose of SNF through off-site disposal methods – first through reprocessing, and then later through the assumption of title to and removal of SNF to a permanent federal repository on or before January 31, 1998 by the Government pursuant to the NWPA. The Government's failure to begin removal of SNF constitutes interference with Canal's investment-backed expectations in a facility unencumbered by SNF storage obligations.

Judge Lettow's decision in *Boston Edison* is supported by considerable regulatory takings case law. The Federal Circuit has long recognized regulatory takings as a means for providing just compensation to takings plaintiffs similarly situated to Canal. For example, in *Yancey*, 915 F.2d 1534 (Fed. Cir. 1991), the plaintiffs alleged that a Government-imposed poultry quarantine deprived them of an economically viable use for the turkeys on their farm, thereby amounting to an unconstitutional deprivation of the plaintiffs' reasonable investment-backed expectations in the commercial use of their property. The Federal Circuit affirmed the plaintiffs' taking claim, finding that "[w]hen adverse economic impact and unanticipated deprivation of an investment-backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate." *Id.* at 1542.

Similarly, in *Huntleigh*, 63 Fed. Cl. at 445, this Court denied the Government's Motion to Dismiss the plaintiff's regulatory taking claim. In *Huntleigh*, a private security company alleged that the passage of the Aviation and Transportation Security

Act and the subsequent federalization of airport security was a regulatory taking. Although the Court ultimately found that the Government acted for a public purpose, Judge Margolis held that "the expense was placed disproportionately on a few private property owners." *Id.* at 448-49 (internal quotation marks and citation omitted). While the Government's purpose may have been legitimate, "the government has not shown that the *actions* Congress took . . . were within its powers to exercise without also granting compensation." *Id.* (internal quotation marks and citation omitted). In the SNF context, Congress recognized that SNF disposal should be the responsibility of the Federal Government. It therefore makes sense that the Government's abandonment of that responsibility (whether permanent or temporary), coupled with its decision to require utilities such as Canal to perform these otherwise governmental functions, requires Canal to be compensated.

Moreover, in *Cienega Gardens*, 331 F.3d 1319, the Federal Circuit found that the federal statutes altering an existing regulatory framework interfered with the plaintiffs' investment-backed expectations and thus were deserving of just compensation. The plaintiffs were owners of low-income apartments who had signed contracts allowing for the prepayment of their mortgages. When the Government passed statutes that prevented the plaintiffs from prepaying their mortgages, the plaintiffs sought just compensation for an unlawful regulatory taking. The Federal Circuit agreed with the plaintiffs. In fact, the *Cienega Gardens* Court rejected many of the same arguments presented by the Government in the present case. For instance, similar to Canal's allegation that the measure of compensation should be the diminished value of its property, the Court found that the Government's action need not dispossess the plaintiff of title to its property, but rather a taking could be found

when the actions "denied them a future enhancement in the value of their property." 331 F.3d at 1339. Furthermore, just as Canal had come to expect that the Government would remove SNF on or before January 31, 1998, the *Cienega Gardens* Court found that the plaintiffs had investment-backed expectations upon demonstrating that "they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Id.* at 1345-46. (internal quotation marks and citation omitted).

**(3) Is this a novel takings theory? If not, cite cases that claim takings for a diminished value of property because of a breach of contract.**

Neither of Canal's takings theories, nor the just compensation alleged as owing to Canal, is novel.[7] Indeed, takings claims identical or nearly identical to Canal's claims have been recognized in numerous other SNF proceedings. *See, e.g., Delmarva,* No. 04-0034C, Order filed Dec. 3, 2004 (denying the Government's identical Motion to Dismiss); *Atlantic,* No. 04-0036C, Order filed Jan. 11, 2005 (same); *Boston Edison,* No. 99-447C, Order and Opinion filed Feb. 15, 2005 (recognizing takings claims independent of the Standard Contract); *SMUD,* 61 Fed. Cl. 438 (holding that the Government's failure to accept SNF resulted in a physical taking of plaintiff's property); *Detroit Edison Co. v. United States,* 56 Fed. Cl. 299 (holding that an SNF plaintiff can assert takings claims independent from breach of contract claims).

In addition to the SNF context, both physical and regulatory takings similar to Canal's have been affirmed by the Supreme Court, the Federal Circuit, and this Court. *See Loretto,* 458 U.S. at 433 (law allowing cable companies to attach equipment to

[7] As discussed *supra,* Canal is not claiming a "takings for a diminished value of property because of a breach of contract." As is described in detail in the answers to Questions 1 and 2, Canal's takings claims are based on property rights independent of the Standard Contract. Furthermore, as explained more fully *supra* pp. 4-6, diminished value is a quantum of damage, not an independent basis for a taking.

apartment buildings requires just compensation); *Benenson,* 548 F.2d at 949 (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing the building's façade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owner's fee interest); *Kaiser Aetna,* 444 U.S. at 180 (taking occurred where Government imposed navigational servitude on landowner's private pond); *Peewee Coal,* 341 U.S. 1 (taking occurred where Government federalized coal mine); *Kimball Laundry,* 338 U.S. at 6 (taking occurred where Government federalized laundry service and retained management and employees to operate plant); *Webb's Fabulous Pharmacies,* 449 U.S. at 160 (a state may not transform private property into public property without just compensation); *Del Monte,* 920 F.2d 1496 (Government's refusal to allow private party to develop its land for use benefiting the public is an unlawful taking); *see also Cienega Gardens,* 331 F.3d at 1346 (taking found where plaintiffs "bought their property in reliance on a state of affairs that did not include the challenged regulatory regime"); *Yancey,* 915 F.2d 1534 (Government-imposed quarantine was regulatory taking); *Huntleigh,* 63 Fed. Cl. at 445 (Government federalized airport security resulting in regulatory taking).

**(4) Plaintiff limits its takings claim to the diminished value of its property. See Tr. at 28 (Jan. 13, 2005). We understand plaintiff's claim to be that factors such as the payment of fees, storage of SNF, and uncertainty about the future of Seabrook contributed to the diminution of plaintiff's property value. Such factors discussed at the hearing were not alternative takings theories or damage theories. See, e.g., Tr. at 35.**

Canal's takings claims arise from three distinct property interests, namely, the taking of its real property interest, the assets associated with its real property, and the going-concern value of the Seabrook facility. Canal is not claiming a taking "for the diminished value of the property." As discussed in greater detail at pp. 4-6, diminished value is the quantum of the just compensation owed to Canal for the taking, as distinguished from the property right which is the subject of the taking.[8] The factors referenced by the Court, including the overpayment of fees to the Nuclear Waste Fund, storage costs for SNF, the continued/ongoing payment of fees, expenses associated with interim storage of SNF, decommissioning costs, and the impact of interim storage on the long-term viability of Seabrook are the natural and foreseeable consequences of the Government takings, all of which negatively impacted the value of Canal's property.

**(5) Plaintiff's claim seems to be that defendant's breach of contract created or resulted in the taking. Takings generally may not result from improper or tortious conduct by the United States. Cite case law to support plaintiff's argument that a breach of contract can give rise to a taking.**

Canal's takings claims are not predicated upon a breach of contract, nor is Canal asserting that the Government acted improperly or tortiously. Rather, Canal's claims are based upon physical and regulatory takings theories arising from the Government's repudiation of its obligations pursuant to the NWPA. Canal is *not* asserting that the Government's breach of the Standard Contract created or resulted in Canal's takings claims. Instead, as recognized by Judge Lettow in the *Boston Edison*

[8] In the January 13, 2005 hearing, counsel for Canal accurately described the impact of the Government's taking on Canal's property interests. Canal limits its request for just compensation for its takings claims to the diminished value of its property (i.e., the difference between the value of Seabrook before and after the Government's taking). However, as discussed *supra*, various factors stemming from the taking resulted in the diminished value of Seabrook.

decision, Canal's takings claims are independent from claims relating to or arising from the Standard Contract. Slip op. at 25-26.

**(6) Plaintiff assigned or transferred its contract rights to FPL Energy Seabrook, according to defendant. Canal has filed a "protective" claim for breach of contract, apparently because a challenge to such transfers is pending. What would be the effect of a successful challenge to plaintiff's assignment of its contract claim? Would plaintiff proceed on a breach claim alone? When will this issue be decided?**

Canal was compelled to file an Amended Complaint alleging breach claims immediately after becoming aware that the Government was asserting in other SNF proceedings that purchasers of nuclear facilities were precluded as a matter of law from acquiring and asserting pre-purchase breach claims. *See* First Amended Complaint ¶ 60; November 4, 2004 Reply to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment on Liability in *Entergy Nuclear Generating Co. v. United States*, No. 03-2626C, at 2 (Fed. Cl. filed Nov. 4, 2004) ("*Entergy*") (Boston Edison was "statutorily barred from assigning any pre-existing damages claims" to plaintiff). Presumably, if the Government successfully challenges the assignment of Canal's breach claims to FPL Energy Seabrook ("FPL Energy"), any assignment of preexisting claims would be invalid and FPL Energy would be precluded from pursuing breach claims that matured prior to its acquisition of Seabrook. At that point Canal may be required to assert breach claims. Canal will thoroughly evaluate any *Entergy* decision regarding the assignment of claims in order to accurately determine its proper course of action.

Should Canal elect to pursue breach claims in the wake of a successful challenge to their assignment, it would do so concurrently with its takings claims. The

Court of Federal Claims has affirmed a plaintiff's right to concurrently pursue both a breach of contract and a takings cause of action in SNF matters. In *Boston Edison*, Judge Lettow found that "Boston Edison may bring contract and takings claims concurrently, but if both claims remain viable, recovery under the contract damages theory is appropriate." Slip op. at 26. This holding is consistent with the ruling of the Court of Federal Claims in *Detroit Edison*, 56 Fed. Cl. 299 (takings and breach claims can proceed to trial concurrently). As in *Boston Edison*, the issue of concurrent pursuit of breach and takings claims was brought before the Court on the Government's Motion to Dismiss. And as in *Boston Edison*, the *Detroit Edison* Court denied the Government's Motion, finding that even if the plaintiff could not recover damages under both theories, the plaintiff would be allowed to pursue both theories and create a more fully developed record. 56 Fed. Cl. at 302; *see also Maine Yankee v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) (breach and takings claims allowed to proceed concurrently); *Boston Edison* No. 99-447C, Order and Opinion filed Feb. 15, 2005; *SMUD*, 61 Fed. Cl. at 442 (same). Canal should be afforded the same opportunity to pursue both of its claims in an effort to create a complete factual record for the Court.

Finally, Canal does not know when the Government's challenge with respect to its assignment of claims challenge will be decided. Judge Lettow held a hearing in the *Entergy* matter regarding the Government's challenge to the assignment of claims in that matter on February 9, 2005. Judge Lettow indicated during that hearing that a decision would be forthcoming. *Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C Tr. at 46-47, (Feb. 9, 2005) (Lettow, J.).

**(7) Plaintiff claims standing as a third-party beneficiary. Defendant argues that plaintiff was not an intended beneficiary of the contract. If Canal is a third-party**

**beneficiary, does this resolve the issue of whether it has standing as a minority owner? Plaintiff argues that its position may be distinguished from that of a shareholder by the fact that it had management duties. What was the nature of its management duties? Does defendant acknowledge that management duties properly distinguish Canal's position here from that of a shareholder with regard to standing?**

Canal has standing to sue as an owner of Seabrook. Canal directly owned its share of the Seabrook physical assets and SNF, and bore its share of the fee payment obligations under the NWPA.[9] Canal's position is clearly distinguished from that of a shareholder in that it had numerous rights, duties, and obligations arising from its ownership interest. As an owner, Canal had a direct and sole obligation to pay its proportionate share of Nuclear Waste Fund fees to the Government. Canal also had a

---

[9] The terms of the Seabrook Standard Contract confirm that Canal was directly obligated to make 1 mil/kWh fee payments to the Nuclear Waste Fund. These issues were discussed at length in the January 13, 2005 hearing. *See* Hearing Transcript, dated January 13, 2005, at 15-16, 21, 24-27, 51-52, 57-61. Canal subsequently filed a Notice of Additional Authority on this point on January 19, 2005. In summary, the § Final Rule, 48 Fed. Reg. 16590, at 16590-01 (April 18, 1983), demonstrates that the Standard Contract was amended to reflect the parties' collective intent to include owners and generators in the Contract. *See* Hearing Transcript, dated January 13, 2005, at 24-25, 57-60. Additionally, page 34 of the Standard Contract, Article XXII, Section C clearly lists Canal as one of the tenant-in-common owners of Seabrook. This provision explicitly provides that

> [p]erformance of this Contract shall be for the account of said owners, and all property and rights of said owners acquired by Purchaser on their behalf under this Contract shall vest in such utilities severally in the aforesaid respective percentage shares; and all obligations of the Purchaser under this Contract, including any charges hereunder, shall be several (and not joint or joint and several) obligations of such utilities in the aforesaid respective percentage shares.

Standard Contract at 34. Therefore, Canal had at all relevant times direct liability for its 3.52% interest in Seabrook under the Standard Contract and was severally and separately obligated to pay its aliquot share of the 1 mil/kWh fee to the Department of Energy.

direct role in key business decisions, including, but not limited to approving significant agreements (i.e., vendor contracts and contracts pertaining to the managing agent), selecting key management personnel, and providing input on regulatory filings and strategies. As an owner of Seabrook, Canal was required to make, along with the other co-owners, significant financial decisions including approving budgets (i.e., operating and decommissioning budgets) and compensation, as well as pension and benefit plans pertaining to Seabrook employees. Additionally, Canal had exclusive and sole control and responsibility with respect to the agreements relating to the sale of its Seabrook ownership interest to FPL Energy, and the agreements relating to FPL Energy's assumption of the managing agent responsibilities. In short, as an owner of Seabrook, Canal has independent standing to bring its claims for taking.

In addition to being an owner of Seabrook at the time of the taking, Canal referenced its status as a third-party beneficiary to the Standard Contract in its Complaint and First Amended Complaint. Canal included this allegation out of an overabundance of caution that arose as a result of the Government's argument that SNF plaintiffs' takings claims arose solely from the Standard Contract. Numerous decisions from this Court have rejected the Government's takings argument, holding instead that a takings claim can be asserted independent from the Standard Contract. *See, e.g.*, *Delmarva*, No. 04-0034C, Order filed Dec. 3, 2004 (denying the Government's identical Motion to Dismiss); *Atlantic*, No. 04-0036C, Order filed Jan. 11, 2005 (same); *Boston Edison*, No. 99-447C, Order and Opinion filed Feb. 15, 2005 (recognizing takings claims independent of the Standard Contract); *SMUD*, 61 Fed. Cl. 438 (holding that the Government's failure to accept SNF resulted in a physical taking of plaintiff's property); *Detroit Edison*, 56 Fed. Cl. 299 (holding that an SNF plaintiff can assert takings claims

independent from breach of contract claims).[10] In our view, the weight of recent SNF authority makes consideration of Canal's status as an express third-party beneficiary unnecessary. Alternatively, to the extent that the Court requires a nexus between Canal's takings claims and the Standard Contract, Canal's status as an express third party intended beneficiary would satisfy such a requirement.

For the foregoing reasons, and for the reasons identified in Canal's Complaint, First Amended Complaint, Response to the Government's Motion to Dismiss, and the hearing thereon, Canal respectfully requests that the Court deny the Government's Motion to Dismiss Canal's takings claims.

[10] Furthermore, unlike suits for breach of contract, a plaintiff alleging a taking can maintain that cause of action without having to demonstrate privity of contract. *See, e.g., Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002) (plaintiff recovers under a takings theory without having to demonstrate privity); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999) (ruling that Court of Federal Claims had jurisdiction over takings claims, even though plaintiffs were not in privity with Federal Deposit Insurance Corporation, and therefore, could not maintain suit for breach); *see also, e.g., Loretto*, 458 U.S. at 433 (same); *Kaiser Aetna*, 444 U.S. at 180 (same); *Peewee Coal*, 341 U.S. 114 (same); *Kimball Laundry*, 338 U.S. at 6 (same); *Benenson*, 548 F.2d at 949 (same).

Date: February 28, 2005

Respectfully submitted,

By: /s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

*Counsel of Record for*
*Canal Electric Company*

Of Counsel:

David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

Timothy N. Cronin
Assistant General Counsel
NSTAR Electric & Gas
Corporation
800 Boylston Street
Mail Stop P1701
Boston, MA 02199-0228

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on February 28, 2005 a copy of the foregoing Canal Electric Company's Response to the Court's February 3, 2005 Order was filed electronically. I understand that the notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/S/
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Canal Electric Company*