# In the United States Court of Federal Claims

No. 99-447C

(Filed: February 15, 2005)

| | |
|---|---|
| ************************************<br>BOSTON EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant.<br>************************************ | Spent nuclear fuel cases; subject matter jurisdiction; standing; motion to dismiss; motion for summary judgment; Nuclear Waste Policy Act of 1982; contract damages; Federal Rules of Evidence 602, 701; Restatement (Second) Contracts § 348(2)(a); collateral estoppel; good faith and fair dealing; takings |

Richard J. Conway, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., for plaintiff. With him on the briefs were David M. Nadler, Nicholas W. Mattia, Jr., Bradley D. Wine, Jeffrey P. Becherer, Dickstein Shapiro Morin & Oshinsky LLP, and Neven Rabadjija, Associate General Counsel, NSTAR Electric & Gas Corp., Boston, MA.

Stefan Shaibani, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director. Of counsel was Jane K. Taylor, Office of General Counsel, United States Department of Energy, Washington, D.C. With Mr. Shaibani at the hearing was Joshua E. Gardner, Civil Division.

## OPINION AND ORDER

LETTOW, Judge.

This case involves the disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). Plaintiff, Boston Edison Company ("Boston Edison") signed a Standard Contract under the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat.

2202 (Jan. 7, 1983) (codified as amended at 42 U.S.C. §§ 10101-10270), which contract obligated the Department of Energy ("DOE") to dispose of spent nuclear fuel and high-level radioactive waste generated by Boston Edison at its Pilgrim Nuclear Power Station ("Pilgrim") beginning no later than January 31, 1998. More than seven years after this deadline, DOE has yet to dispose of any SNF from Pilgrim or any other nuclear power plant, and the earliest anticipated commencement of such disposal is now some time after 2010.

Boston Edison sold the Pilgrim nuclear electric generating plant to Entergy Nuclear Generation Company ("Entergy") in 1999. The sales contract included an assignment of the Standard Contract for disposal of SNF and HLW, as authorized by Section 302 of the NWPA, as amended, 42 U.S.C. § 10222.[1] As the parties have construed the assignment, it permitted Boston Edison to retain claims for damages accrued as of the closing date, with Entergy acquiring later accruing claims. Both Boston Edison and Entergy have filed claims against the United States in this court.[2]

Boston Edison alleges a partial breach of contract, a breach of the implied duty of good faith and fair dealing, and an uncompensated taking. The government filed a motion to dismiss the former two claims for lack of standing, claiming that Boston Edison has suffered no injury in fact because the Department of Energy's disposal procedure did not call for pick up and disposition of the spent nuclear fuel at Boston Edison's plant until after the date of the facility's sale. Boston Edison responds that it has suffered injury by way of the diminution in value of the facility at the time of the sale, its expenses to store the spent nuclear fuel prior to sale, and its inability to purchase an earlier disposal time in the SNF queue under Article V.E. of the Standard Contract. The government has also filed a motion for summary judgment on all three counts of the complaint. Boston Edison has filed a cross-motion for summary judgment on its partial breach of contract claim. For the reasons discussed below, the government's motions to dismiss and for summary judgment are denied, and Boston Edison's cross-motion is also denied.

**BACKGROUND**

Over the past nine years, the D.C. Circuit, the Federal Circuit, and this court have issued numerous decisions regarding the contracts and arrangements for storage and disposal of spent

---

[1]The specific provision authorizing assignments provides in pertinent part that "[t]he rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved." 42 U.S.C. § 10222(b)(3).

[2]Entergy's claim has been docketed as *Entergy Nuclear Generation Co. v. United States*, No. 03-2626C (filed Nov. 5, 2003).

nuclear fuel and high-level radioactive waste.[3] Given this background, only the facts relevant to the motions presently before the court are recounted here.[4]

A. *The NWPA*

On January 7, 1983, the NWPA was enacted, authorizing the Secretary of the Department of Energy to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). The NWPA conditioned the Nuclear Regulatory Commission's renewal of nuclear facilities' licenses on their entering into, or negotiating in good faith towards, such a contract for the disposal of spent nuclear fuel. 42 U.S.C. § 10222(b)(1)(A). After a notice and comment period, DOE promulgated a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, codified at 10 C.F.R. § 961.11 ("Standard Contract"). *See* 48 Fed. Reg. 5,458 (Feb. 4, 1983). Under the Standard Contract, nuclear facilities paid (or deferred, subject to accrual of interest) a one-time fee based on electricity generated prior to April 7, 1983, *see* Standard Contract, art. VIII (B)(2); *Commonwealth Edison v. Dep't of Energy*, 877 F.2d 1042, 1043-44 (D.C. Cir. 1989), and they have paid a continuing fee based on the amount of further electricity a facility generated and sold. Standard Contract, art. VIII. In exchange, DOE was obliged to begin its disposal services no later than January 31, 1998. *Id.*, art. II.[5] By 1994, no

---

[3]*See, e.g.*, *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1350-51 (Fed. Cir. 2001); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000) ("*Northern States II*"); *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 756-58 (D.C. Cir. 1997) ("*Northern States I*"); *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1273-74 (D.C. Cir. 1996) ("*Indiana Michigan I*"); *Florida Power & Light Co. v. United States*, __ Fed. Cl. __, 2005 WL 318678 (Jan. 31, 2005); *Sacramento Mun. Util. Dist. v. United States*, __ Fed. Cl. __, 2005 WL 242130 (Jan. 19, 2005); *Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665, 666-70 (2004); *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 640-42 (2004) ("*Indiana Michigan III*"); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 90-94 (2003) ("*Indiana Michigan II*"); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 654-55 (2003); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 300 (2003); *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 225-229 (1998).

[4]The recitation of background facts that follows does not constitute findings of fact by the court. Rather, the factual elements are taken from the parties' filings and are either undisputed or are alleged and assumed to be true for purposes of the jurisdictional analysis that follows.

[5]This date was specified in the Standard Contract in conformity with the express requirements of the NWPA. *See* 42 U.S.C. § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this

repository had been built nor had the Department of Energy provided a temporary storage facility, and the Department announced that it did not anticipate it would be able to begin disposing of SNF by the 1998 deadline. *See* 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). DOE subsequently estimated that the earliest time a disposal site would be ready was 2010. Plaintiff's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 10; 60 Fed. Reg. 21,793, 21,794 n.1 (May 3, 1995). More recently, the Department has indicated that pick up and disposition of SNF and HLW will be postponed to some time after 2010.[6]

B. *The Standard Contract*

The Standard Contract lays out the procedure by which DOE anticipated SNF would be collected. Under Article IV.B.5(b) of the Standard Contract, starting no later than July 1, 1987, DOE was to issue annual capacity reports ("ACRs") for planning purposes. These ACRs "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." Standard Contract, art. IV.B.5(b). This report by DOE was to determine the amount of total SNF that DOE would accept in a given year. Which SNF DOE would accept was to be determined in part by the annual priority rankings ("APRs"), and the general rule was that the oldest fuel or waste was to be given the highest priority. *Id.*, arts. IV.B.5(a), VI.B.1.

Beginning January 1, 1992, the nuclear facilities could submit to DOE delivery commitment schedules ("DCS"), which identified "all SNF and/or HLW [the facility] wishes to deliver to DOE beginning sixty-three (63) months thereafter." *Id.*, art. V.B.1. The facility had the right to "adjust the quantities of SNF and/or HLW plus or minus (+-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." *Id.*, art. V.B.2. Not less than twelve months before the delivery date, the facility was to submit a final delivery schedule ("FDS"), which was subject to DOE approval. *Id.*, art. V.C. Facilities also had the right to "exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW," provided that DOE approved a request submitted not less than six months before the delivery. *Id.*, art. V.E. This provision created what some in the industry called "SNF put-option trading." *See* Plaintiff's Response to

---

subchapter.").

[6]*See* Letter from David Zabransky, Contracting Officer, Department of Energy, to Frank Rives, Entergy Operations, Inc., dated December 1, 2004 (stating that the planning processes in the Standard Contract would be resumed "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository"). *See also Nuclear Energy Institute v. Environmental Protection Agency*, 373 F.3d 1251 (D.C. Cir. 2004) (addressing issues associated with the selection of Yucca Mountain, Nevada, as the site of a nuclear waste repository for the nation).

Defendant's Proposed Findings of Uncontroverted Fact ("PRDFUF") ¶ 9. In 1997, when it became manifestly evident that a repository would not be in place by 1998, DOE officials suspended the DCS process. Hr'g Tr. at 40, 44. Pl.'s Post-Hr'g Rep., Ex. 2 at 362-63 (Dep. of David Zabransky) (Apr. 17, 2002).[7]

C. *Boston Edison's Activities*

Boston Edison is an operating subsidiary of NSTAR, an energy company that provides electricity, gas, and related energy services in Eastern and Southern Massachusetts. Am. Compl. ¶ 12. Prior to July 13, 1999, Boston Edison was the owner and sole proprietor of the Pilgrim Nuclear Power Station in Plymouth, Massachusetts. PFUF ¶ 1; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("DRPFUF") ¶ 1. On June 17, 1983, Boston Edison executed a Standard Contract with the Department of Energy for the disposal of Pilgrim's SNF and HLW. Defendant's Proposed Findings of Uncontroverted Fact ("DFUF") ¶ 28; PRDFUF ¶ 28. In 1993, the Department of Energy approved Pilgrim's delivery commitment schedule for 1999, Def.'s App. 253-54 (Letter from Beth Tomasoni, Contracting Officer, to W.C. Rothert, General Manager, Technical, Boston Edison (Dec. 6, 1993)), and the parties dispute whether this DCS required delivery by December 31, 1999 or January 30, 2000. DFUF ¶ 34; PRDFUF ¶ 34; Pl.'s Post-Hr'g Rep. at 3.[8] DOE also approved Boston Edison's DCS submissions for the years 2000 and 2001. DFUF ¶¶ 35-36. In September 1998, after DOE had suspended the DCS process, Boston Edison submitted a DCS application for 2004. Pl.'s Post-Hr'g Rep. at 3; DFUF ¶ 36 n.2. On November 24, 1998, DOE rejected that application, stating that DOE "is not able at this time to approve your DCS submittal" and waiving the requirement under the Standard Contract that facilities provide a revised schedule within 30 days of a DCS rejection. DFUF ¶ 36 n.2; Standard Contract, art. V.B.1. Boston Edison did not submit a final delivery schedule because the suspension of the DCS process and other events indicated that DOE no longer planned to dispose of SNF in accordance with the previously filed DCS submissions. *See* Pl.'s Post-Hr'g Rep. at 2-5.[9]

---

[7]Mr. Zabransky's deposition testimony states that the suspension was initiated "sometime over a year" after March 1995. Boston Edison, citing Mr. Zabransky's testimony, suggests that the suspension began "perhaps as early as March of 1996." Pl.'s Post-Hr'g Rep. at 3-4; Pl.'s Post-Hr'g Rep., Ex. 2 at 362-63. Nonetheless, counsel at the hearing used the 1997 date for the suspension. At this juncture, the court need not make a determination of a precise date for this suspension. Any such determination is reserved for future proceedings, if and as it should become necessary. *See Tennessee Valley Auth.*, 60 Fed. Cl. at 672 n.8.

[8]This dispute does not affect the substance of the government's argument because both dates postdate the sale of the nuclear facility. DFUF ¶ 43.

[9]During this past year, steps were taken to renew the DCS process but then were again halted. In July 2004, DOE sent new instructions to holders of Standard Contracts directing them to submit DCSs "to inform DOE of their plans for utilizing their allocations of projected Civilian

After DOE had failed to begin its services under the Standard Contract by 1998, Boston Edison entered a Purchase and Sale Agreement to sell Pilgrim. In the Agreement, Boston Edison agreed to assign its rights under the Standard Contract to Entergy reserving the right to "any claims of Seller related or pertaining to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing Date, whether relating to periods prior to or following the Closing Date." Def.'s App. 310 (Purchase and Sale Agreement ¶ 2.2(g)); DFUF ¶ 38. The sale closed on July 13, 1999, and Boston Edison's assignment of rights and duties under the Standard Contract to Entergy was effective on that date. DFUF ¶ 40. At the time of the sale, Boston Edison had fully paid its required DOE fees under the Standard Contract, amounting to more than $88 million. Pl.'s App. 2 (Aff. of Geoffrey O. Lubbock (July 6, 2004) ("Lubbock Aff.")); PFUF ¶ 14; DRPFUF ¶ 14.[10]

D. *This Lawsuit*

Boston Edison filed its original complaint in this case on July 12, 1999, one day prior to the closing date for its sale of Pilgrim. In its amended complaint, Boston Edison alleges three counts against the government. First, it claims that the government committed a partial breach of the contract by failing to perform its obligations under the Standard Contract by the deadline. Am. Compl. ¶¶ 72-75. Second, Boston Edison claims that the government breached its implied covenant of good faith and fair dealing by "failing to take appropriate action to meet its contractual commitment to begin accepting Boston Edison's SNF for disposal by January 31, 1998." *Id.* ¶¶ 76-79. Third, Boston Edison alleges that the requirement that it store SNF on its property constitutes an uncompensated taking. *Id.* ¶¶ 80-84.

---

Radioactive Waste Management System (CRWMS) acceptance capacity. 2004 DCS Instructions ¶ 1. DOE "recognize[d] that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a). Subsequently, however, DOE stopped this new DCS process. In letters dated December 1, 2004, DOE stated that "recent developments . . . have led the Department to conclude that the resumption of the DCS process was premature," and it returned any DCS forms that contract holders had submitted in response to the Department's July 2004 instructions. Letter from David Zabransky, Contracting Officer, Department of Energy, to Frank Rives, Entergy Operations Inc., dated December 1, 2004. DOE advised that a further resumption of the DCS process would turn on "a revised date for the initial operation of the Yucca Mountain repository." *Id.*

[10]This fact is in dispute insofar as the amount of the payments is concerned. Boston Edison claims that its payments exceeded $89 million, while the government's records indicate that Boston Edison had paid approximately $88.6 million into the Nuclear Waste Fund. PFUF ¶ 14; DRPFUF ¶ 14.

The government has responded with a motion to dismiss the first two counts, and a motion for summary judgment on all three counts. The government claims that Boston Edison has no standing to sue because it has suffered no injury in fact from the alleged breach. According to this argument, Boston Edison had no contractual right to pick up and disposal of SNF until January 31, 2000, the last possible date disposal was to commence under Boston Edison's first approved DCS, which date was more than six months after the sale of Pilgrim. Boston Edison responds that the government is collaterally estopped from arguing that the DCS process is effective to limit the government's obligation under the Standard Contract. Boston Edison also avers that it suffered injury from the expenses taken to store the SNF on-site, from the diminution of the property's value when it was sold, and from its inability to engage in SNF put-option trading. Its diminution-in-value claim relies in principal part on the affidavit of Geoffrey Lubbock, the Vice President of Financial Strategic Planning and Policy for NSTAR, the person primarily responsible for the sale of Pilgrim. Pl.'s App. at 1 (Lubbock Aff. ¶¶ 1, 3). The government has moved to strike the Lubbock affidavit, claiming that Mr. Lubbock lacks the personal knowledge or expertise to testify as to what bidders would have done if not for the alleged breach. Defendant's Motion to Strike Lubbock Affidavit ("Def.'s Mot. to Strike") at 6. The government also challenges Boston Edison's taking claim, seeking judgment as a matter of law that the alleged taking derives from a contract and that contractual remedies displace or foreclose a takings claim.

The court held a hearing on these motions on August 31, 2004. At the hearing, the court requested and subsequently received supplemental submissions on a handful of issues. Still later, on October 26, 2004, the government moved for supplemental briefing on the jurisdiction of the D.C. Circuit to adjudicate disputes over Nuclear Waste Fund fees. The court granted that motion, and the last supplemental brief was filed December 7, 2004. Each of the parties' arguments is examined in turn below.

**STANDARD FOR DECISION**

There is some dispute over whether to treat motions to dismiss for lack of standing under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") concerning absence of subject matter jurisdiction, or under RCFC 12(b)(6) respecting failure to state a claim upon which relief may be granted. *Compare Landmark Land Co. v. Federal Deposit Ins. Co.*, 256 F.3d 1365, 1380 (Fed. Cir. 2001) (treating standing as "a component of subject matter jurisdiction"), *with Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 925 (Fed. Cir. 1991) (affirming a dismissal for failure to state a claim due to lack of standing); *see also Dawnwood Properties/78 v. United States*, 53 Fed. Cl. 168, 171 (2002) (suggesting that constitutional limitations such as the adequacy of injury should be treated as questions of subject matter jurisdiction while prudential considerations should be treated under the standards of RCFC 12(b)(6)). It is unnecessary to decide this issue in this case because Boston Edison avers sufficient injury to satisfy both constitutional and prudential considerations respecting standing, and thus its amended complaint passes muster under both RCFC 12(b)(1) and 12(b)(6).

Regardless of which standard is used, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A plaintiff invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged." *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (citing *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)).

Summary judgment is appropriate when the pleadings and the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). In ruling on a motion for summary judgment, a court must resolve all issues in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). If no rational trier of fact could find for the non-moving party, the court should grant summary judgment. *Id.* at 587. When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and denial of both motions is appropriate if genuine disputes over material facts exist. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

## ANALYSIS

### *SUBJECT MATTER JURISDICTION*

In the supplemental briefing initiated by the government, the parties addressed questions about whether this court has subject matter jurisdiction over this action. Although Boston Edison and the government take somewhat different positions regarding the *scope* of this court's jurisdiction, neither of them argues that this court is bereft of the power to consider this dispute. Nonetheless, a very recent decision by another judge of this court holds that provisions of the NWPA operate to displace the jurisdiction this court would otherwise have under the Tucker Act over this contract case. *See Florida Power*, __ Fed. Cl. __, 2005 WL 318678. For the reasons that follow, this court respectfully disagrees with both the rationale and result in *Florida Power* and concludes that it has jurisdiction over this case.

#### *A. Tucker Act*

By its terms, the Tucker Act, 28 U.S.C. § 1491, provides this court with jurisdictional power over this case. The opening provision of that Act has been in place for a great many years and states that this court may hear "any claim against the United States founded either upon . . . any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This statute does not by itself dictate the substantive law governing the case. *United States v. Testan*, 424 U.S. 392, 398 (1976). In this instance, Boston Edison has entered into an express contract, the Standard Contract, with the Department of Energy, and common law contract principles supply

the substantive legal framework for the court's assessment of disputes over the terms of this contract.

The generally applicable jurisdiction in this court over claims arising under contracts with the federal government applies unless the Tucker Act has been displaced or modified by explicit federal statutory law or treaty. The exceptions are few and far between. One such exception is set out in the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. § 839f(e)(5), which grants exclusive jurisdiction to a regional circuit, *i.e.*, the Ninth Circuit, to review certain actions of the Bonneville Power Authority that would otherwise overlap with this court's jurisdiction under the Tucker Act. Where that overlap occurs, the jurisdictional terms of the Northwest Power Act displace the generally applicable provisions of the Tucker Act, and as a result this court is divested of the jurisdiction it otherwise would have. *Compare Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 925-27 (9th Cir. 2002) (claims of breach of contract and inverse condemnation could not be separated from an action of the Bonneville Power Authority subject to the Ninth Circuit's exclusive jurisdiction), *cert. denied*, 539 U.S. 914 (2003), *with Public Util. Dist. No. 1 v. Johnson,* 855 F.2d 647, 650 (9th Cir. 1988) (breach of contract that was not action subject to Ninth Circuit's review jurisdiction should be heard in Claims Court). The jurisdictional provisions in the Northwest Power Act that grant the Ninth Circuit exclusive jurisdiction to review specified actions apply *only* to those specified actions, and consequently this court's general jurisdiction under the Tucker Act is displaced *only* where the Bonneville Power Authority's actions under a contract are mandated by statute or involve a rate set by the Authority pursuant to statutory requirements. *See City of Burbank v. United States*, 273 F.3d 1370, 1377-81 (Fed. Cir. 2001); *Southern Cal. Edison v. United States*, 58 Fed. Cl. 313, 317-20 (2003).

For federal district courts, other statutes have a similar effect in different subject-matter areas. Those statutes, relatively few in number, grant a particular court, usually a court of appeals, exclusive jurisdiction over suits arising in expressly defined areas, displacing a more general jurisdiction that would otherwise give juridical power to a district court. One such example is Section 307(b)(1) of the Clean Air Act, as amended, 42 U.S.C. § 7607(b)(1), which grants exclusive jurisdiction to review action by the Environmental Protection Agency in setting national air-emission environmental standards to the D.C. Circuit, while granting jurisdiction to regional circuits to review "any other final action of the Administrator [of the Environmental Protection Agency] . . . which [action] is locally or regionally applicable." This statutory arrangement gave rise to the question whether the jurisdictional grants to federal courts of appeals left any role for jurisdiction in district courts to review action by the Environmental Protection Agency under the Clean Air Act. Ordinarily, action by a federal agency, whether taken on a formal or informal basis, would be reviewable in a federal district court under the general federal-question jurisdictional statute, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D). In *Harrison v. PPG Industries, Inc.*, 446 U.S. 578 (1980), the owners of a facility subject to a ruling made informally by a letter, applying certain new source performance standards to that facility, had sought review of that action both in a district court and in the Fifth Circuit because of uncertainty about the proper forum. The

Supreme Court held that the Fifth Circuit had jurisdiction over the action, rejecting a contention that district court jurisdiction was preserved because the phrase "any other final action" in the statute should be construed to apply only to actions under specifically enumerated provisions of the statute that precede the catchall phrase or to actions similar to the enumerated provisions under the doctrine of *ejusdem generis*. The Court concluded that "there was no uncertainty in the phrase 'any other final action'" and that the expansive language had to "be construed to mean exactly what it says." *Harrison*, 446 U.S. at 589. Congressional silence on the enactment of the jurisdictional provisions of the Clean Air Act was given no weight by the Court because "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." *Id*. at 592.

From the Supreme Court's decision in *Harrison* and from the rulings by the Federal and Ninth Circuits construing the jurisdictional provisions of the Northwest Power Act, one can readily discern that special jurisdictional provisions in particular statutes are to be construed to displace a general jurisdictional grant to a court *only* where the special jurisdictional provisions explicitly by their own terms require that result. This unremarkable set of outcomes reflects several underlying principles of statutory construction. First, the language of jurisdictional statutes is to be parsed with precision and fidelity to their express terms. *See Stone v. Immigration and Naturalization Serv.*, 514 U.S. 386, 405 (1995) (jurisdictional statutes "must be construed with strict fidelity to their terms") (citing *Cheng Fan Kwok v. Immigration and Naturalization Service*, 392 U.S. 206, 212 (1968)). Second, specific statutes govern over general statutes. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992). And, third, repeals by implication are disfavored. *See Branch v. Smith*, 538 U.S. 254, 273 (2003) ("[A]bsent 'a clearly expressed congressional intention,' . . . 'repeals by implication are not favored.'") (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974), and *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n*, 393 U.S. 186, 193 (1968)).

*B. Nuclear Waste Policy Act of 1982*

The NWPA contains a special set of jurisdictional provisions in Section 119, codified at 42 U.S.C. § 10139(a). Subsection 119(a) provides in pertinent part:

> (1) Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action–,
> (A) for review of any final decision or action of the Secretary, the President, or the Commission *under this subtitle*;
> (B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required *under this subtitle*;
> (C) challenging the constitutionality of any decision made, or action taken, under any provision *of this subtitle*;
> (D) for review of any environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) with respect to any action

> *under this subtitle*, or as required under section 135(c)(1), or alleging a failure to prepare such statement with respect to any such action;
> (E) for review of any environmental assessment prepared under section 112(b)(1) or 135(c)(2); or
> (F) for review of any research and development activity under title II.
>
> (2) The venue of any proceeding under this section shall be in the judicial circuit in which the petitioner involved resides or has its principal office, or in the United States Court of Appeals for the District of Columbia.

42 U.S.C. § 10139(a). Section 119 is included within Subtitle A of Title I, so the references to "this subtitle" in Subparagraphs (A), (B), (C), and (D) of Paragraph 119(a)(1) refer to that Subtitle of Title I. Subparagraphs (D) and (E) refer to actions taken under two specific sections of the Act, both of which sections are also contained within Title I although one of the cited sections (Section 135) is contained in Subtitle B, not Subtitle A, of Title I. The only portion of Subsection 119(a) that refers to a provision outside Title I is Subparagraph (a)(1)(F) which addresses "research and development activity under title II." No provision of Subsection 119(a) relates to a matter embraced within Title III of the Act.[11]

These references to specific portions of the Act are crucially significant for jurisdictional purposes. As originally enacted, the NWPA contained three separate titles.[12] Title I, entitled "Disposal and Storage of High-Level Radioactive Waste, Spent Nuclear Fuel, and Low-Level Radioactive Waste," focuses on establishing a schedule for the creation and operation of repositories and defining the relationship between the federal government, state governments, and tribal governments in doing so. Title I includes four subtitles: Subtitle A on "Repositories for Disposal of High-Level Radioactive Waste and Spent Nuclear Fuel," Subtitle B called "Interim Storage Program," Subtitle C on "Monitored Retrievable Storage," and Subtitle D entitled "Low-Level Radioactive Waste." Title II addresses research and development issues surrounding waste disposal sites and storage. Title III is a miscellaneous section, entitled "Other Provisions Relating to Radioactive Waste." *See* heading preceding 42 U.S.C. §§ 10221-10226.

The SNF cases pending before the court, including Boston Edison's, are based on the Department of Energy's failure to comply with its disposal obligations under the Standard Contract and Section 302(a)(5)(B) of NWPA, as amended, 42 U.S.C. § 10222(a)(5)(B), which appears in Title III of the Act. In short, regarding a dispute over the Standard Contract, nothing in Section 119 of the NWPA purports to provide an alternative, exclusive jurisdictional path that

---

[11]The references to "title" and "subtitle" are to the NWPA as enacted. The codification in United States Code Annotated replaces those descriptions, albeit inconsistently, with "subchapter" and "part."

[12]Two further titles, Titles IV and V, were added by later amendment to the Act, but those added titles are not pertinent to the jurisdictional inquiry here.

would displace the otherwise generally applicable jurisdictional statutes, including especially the Tucker Act.

*C. District of Columbia Circuit Precedent*

In several prior decisions, the D.C. Circuit addressed the appropriate forum to remedy breaches of the Standard Contract. *Northern States I* concerned a petition for a writ of mandamus filed by utilities and state commissions seeking to require DOE to begin disposing of SNF and HLW by the statutory deadline. The D.C. Circuit refused to issue a broad writ of mandamus, ruling that the utilities had available another potentially adequate remedy, namely, that for breach of contract. *Northern States I*, 128 F.3d at 759. The court nonetheless issued a narrow writ of mandamus "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Id.* at 761. By this limited step, the D.C. Circuit sought to preserve "the remedial scheme of the Standard Contract," *id.*, which, of course, referred to contractual remedies in this court under the Tucker Act, while simultaneously giving force to its "prior conclusion that the NWPA imposes an unconditional obligation on the Department to begin disposal of the SNF by January 31, 1998." *Id.* That "prior conclusion" had been rendered in *Indiana Michigan I*. *See* 88 F.3d at 1273, 1275-76.

Subsequently, a utility sought mandamus to obtain a declaration from the D.C. Circuit that DOE was obliged to provide both monetary and non-monetary relief for DOE's breach. The D.C. Circuit explicitly rejected the argument that Section 119 of the NWPA granted it jurisdiction to address the utility's argument, deferring to this court's jurisdiction under the Tucker Act:

> Nor do we have jurisdiction to consider Wisconsin Electric's petition pursuant to the NWPA, 42 U.S.C. § 10139(a)(1). Insofar as it is relevant to the case at bar, [Section 119 of the NWPA] grants the court jurisdiction over cases seeking review of: (1) final action taken by the agency pursuant to the NWPA, and (2) the agency's failure to take any action required by the NWPA . . . . *The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes*.

*Wisconsin Elec. Power Co. v. United States Dep't of Energy*, 211 F.3d 646, 648 (D.C. Cir. 2000) (emphasis added). Thus, the D.C. Circuit abjured any expansion of Section 119 of the NWPA to reach beyond the matters expressly enumerated in that statute, and in doing so, the D.C. Circuit explicitly refused to curtail or displace this court's jurisdiction under the Tucker Act.[13] *See also*

---

[13]One early decision by the D.C. Circuit, *General Electric Uranium Mgmt. Corp. v. Dep't of Energy*, 764 F.2d 896 (D.C. Cir. 1985), held that it had original and exclusive jurisdiction to review DOE's rule regarding the calculation of the one-time fee under the NWPA. That case did not involve a breach of contract claim. Given the more recent decisions by the D.C. Circuit, *General Electric* is limited to its holding that the D.C. Circuit has exclusive jurisdiction to review DOE's rules regarding fee rates under the NWPA.

*Brown v. United States*, 389 F.3d 1296 (D.C. Cir. 2004) (holding that the Court of Federal Claims has exclusive jurisdiction over breach-of-contract claims exceeding $10,000, and ordering that a complaint filed in district court respecting such a claim be dismissed without prejudice to permit refiling in the proper court).

*D. Federal Circuit Precedent*

Applicable precedents in the Federal Circuit also uphold this court's jurisdiction over these contract cases under the Tucker Act. The Federal Circuit in *Maine Yankee* was faced with the issue of whether SNF plaintiffs had to file an administrative claim with a contracting officer under the Standard Contract's dispute provision before filing suit under the Tucker Act in this court. The Federal Circuit held that the utilities' breach-of-contract claims did not fall within the disputes clause because the claims were far broader than matters addressed by that clause. *Maine Yankee*, 225 F.3d at 1340-42. In *Maine Yankee*, the Federal Circuit also affirmed a partial grant of summary judgment for the utilities that DOE's failure to begin disposal services by January 31, 1998 constituted a breach. *Id*. at 1343. The court held that "the excusable delays provision would fall far short of the relief necessary adequately to compensate Yankee for the damages it alleges it suffered from the government's breach of contract." *Id*. at 1342. In sum, the Federal Circuit upheld action by this court in the exercise of its jurisdictional authority under the Tucker Act.[14]

*E. Florida Power & Light*

On January 31, 2005, a judge of this court issued an opinion holding that this court has no jurisdiction to consider claims arising from breach of the Standard Contract. The issue was raised *sua sponte*, and was not supported by the arguments of any party in the cases before the court. *Florida Power*, ___ Fed. Cl. at ___, 2005 WL 318678, at *1-2. The principal legal conclusion reached in *Florida Power* is that Congress intended to vest original and exclusive jurisdiction over the entire NWPA in federal courts of appeals. Because Title III was created late in the legislative process, the omission of Title III from the jurisdictional provisions of Section 119 was deemed to be merely a "drafting error or oversight." *Id.* at *27. This court respectfully disagrees.

The decision in *Florida Power* is based upon pure supposition, using legislative silence and then speculation to superimpose an idiosyncratic view of congressional intent on explicit jurisdictional terms. The effect of this wholly improper superimposition is to rewrite the statutory language in the NWPA as if it provided simply that all actions taken under the NWPA were to be reviewable in the courts of appeals. In the process, the holding of *Florida Power* overrides and renders surplusage the detailed legislative text that delineates those actions which Congress provided shall be reviewable exclusively in the courts of appeals. Among other things,

[14]*Northern States II* was decided by the Federal Circuit simultaneously with *Maine Yankee* and reached the same result. *See Northern States II*, 224 F.3d at 1367.

the approach to statutory interpretation employed in *Florida Power* contravenes the fundamental canon of construction for jurisdictional statutes that they "must be construed with strict fidelity to their terms." *Stone v. Immigration and Naturalization Service*, 514 U.S. at 405.

The result in *Florida Power* also proceeds from an erroneous premise. Like Title III, Title II was a late addition to the Act, but 42 U.S.C. §10139(a)(1)(F) explicitly grants exclusive jurisdiction to courts of appeals over "review of any research and development activity under title II." *Id*. Logically, Congress could also have added actions taken under Section 302 in Title III to the list of matters exclusively reviewable in courts of appeals, but it did not. In all events, silence in the legislative history about what Congress believed it was enacting provides no basis for interpreting the text of Section 119. *See Harrison*, 446 U.S. at 589, noted *supra*, at 10. The statutory words govern interpretation, not speculation about what Congress might have done.

*F. Synopsis*

The plain meaning of Section 119 is that it grants original and exclusive jurisdiction to courts of appeals in six instances, each of which relates to actions under portions of Title I and Title II of the NWPA. Jurisdiction over actions taken under Title III is not affected at all by Section 119. In short, this court rejects the holding in *Florida Power* that Section 119 displaces this court's jurisdiction under the Tucker Act over an alleged breach of a Standard Contract entered by DOE and a utility in accord with Section 302(a)(5)(B) of NWPA, a part of Title III. The Tucker Act grants this court subject matter jurisdiction over claims arising under the Standard Contract, and the NWPA does not displace this jurisdictional grant. The D.C. Circuit and Federal Circuit both concur that jurisdiction in this court is appropriate over disputes arising under the Standard Contract. For these reasons, the contrary holding in *Florida Power* is respectfully rejected as untenable.

*STANDING*

To satisfy the minimum constitutional threshold for standing in a federal court, a plaintiff must have suffered an injury in fact that is fairly traceable to the conduct of the defendant, and it must be likely that the injury would be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Injury in fact is an invasion of a legally protected interest that is both (1) "concrete and particularized" as well as (2) "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations and citation omitted). A particularized injury is one that affects the plaintiff in "a personal and individual way." *Id*. at 560 n.1. The plaintiff's burden to establish each of these elements corresponds to the stage of the litigation. *Id*. at 561. Here, because the government has moved either to dismiss or in the alternative for summary judgment, the more demanding summary judgment standard must be met. *See id*.

The government has challenged plaintiff's injury in fact, claiming that any injury attributable to its failure to pick up and dispose of SNF has been suffered by Boston Edison's successor in interest. Defendant's Motion to Dismiss ("Def.'s Mot. to Dismiss") at 9. The

government argues that the earliest date of a breach was January 30, 2000 (or, assuming Boston Edison's version of the facts to be true, December 31, 1999), the last day in the year-long range of disposal dates under Boston Edison's first DCS. Boston Edison claims that the DCS submissions do not limit the government's obligations under the contract and that the government's suspension of the DCS process prior to Boston Edison's deadline for submitting a FDS further reflects their precatory, non-binding nature. In addition, Boston Edison cites three types of damages. Pl.'s Reply in Support of its Cross-Motion for Summary Judgment ("Pl.'s Reply") at 2. First, it claims that it should recover the diminution in the Pilgrim plant's value as well as those costs it avers to be directly attributable to the breach. Second, Boston Edison alleges that it suffered re-racking expenses to store the fuel it continued to keep on its premises. Third, Boston Edison avers that DOE's failure to begin disposal prior to January 31, 1998 constituted a breach of every Standard Contract, and, because DCS submissions were not binding, the court should determine the missing pieces of the contract.

Boston Edison's expectation interest is the appropriate starting point for evaluating DOE's alleged breach and any resultant injury. Compensation through damages is the ordinary remedy for a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64.1, at 5 (4th ed. 2002). In a case of a partial breach, such as the present circumstance where Boston Edison's successor, Entergy, is still awaiting commencement by the government of disposal services, awarding Boston Edison or Entergy, or both, damages for their separate expectation interests is appropriate. Such relief would measure each party's "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." *Restatement (Second) of Contracts* § 344(a) (1981) (hereafter "*Restatement (Second) Contracts*"). The expectation interest, subject to certain exceptions, is measured by "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *Id.* § 347. Each of the damages averred by Boston Edison will be evaluated against these benchmarks to determine Boston Edison's injury in fact and thus standing.

*A. Sale of Pilgrim*

Boston Edison's first argument is that it suffered damages in two different ways in connection with its sale of the Pilgrim plant. First, Boston Edison alleges that fewer bidders were interested in purchasing Pilgrim because of the uncertainty surrounding the disposal of SNF. Second, part of the license-transfer process entailed the transfer of a fully funded decommissioning trust fund to the buyer. Boston Edison alleges that the uncertainty resulting from DOE's actions resulted in its transferring a "much larger" decommissioning trust fund to the buyer than would have otherwise been necessary.

To crystallize its argument on the plant's diminished value, Boston Edison has furnished an affidavit of Geoffrey Lubbock, the executive in charge of the auction of Pilgrim. The

government has moved to strike seven paragraphs from this affidavit. Because the motion to strike raises a threshold issue, that motion is addressed initially.

*1. Affidavit of Geoffrey Lubbock.*

The government moves to strike paragraphs 9-15 of Mr. Lubbock's affidavit, which contain observations and opinions about the alleged diminution of the plant's value. The government's motion rests on RCFC 56(e).[15] More specifically, the government challenges the admissibility of those paragraphs of Mr. Lubbock's affidavit under Fed. R. Evid. 602, 701, and 702. According to the government's arguments, Mr. Lubbock lacks the personal knowledge to testify to the observations and opinions in the designated paragraphs, and, to the extent the plaintiff is putting him forward as an expert, his testimony does not satisfy Fed. R. Evid. 702. Among the challenged representations is Mr. Lubbock's claim that "the low number of Pilgrim bidders relative to the number of [bidders when Boston Edison auctioned its fossil-fuel-fired generating plants] was affected by the increased risk and cost associated with the uncertain future of permanent disposition of SNF." Lubbock Aff. ¶ 10. The government claims that Mr. Lubbock is unqualified to make such assertions without knowing the valuation models of Pilgrim's prospective and actual bidders. Def.'s Mot. to Strike at 6.

Boston Edison responds by stating that the Lubbock affidavit is offered as further evidence of its damages in response to the government's motion to dismiss and that it intends to develop additional testimony after discovery. Plaintiff's Response to Motion to Strike Lubbock Affidavit ("Pl.'s Resp. to Mot. to Strike") at 2. It also asserts that Mr. Lubbock's role in running the auction held respecting the Pilgrim plant qualifies him to testify about his perceptions concerning potential bidders. Boston Edison concedes that, at least at this point, Mr. Lubbock is not being offered as an expert, so Mr. Lubbock's affidavit is not proffered under Fed. R. Evid. 702.

---

[15]RCFC 56(e) requires that affidavits supporting and opposing motions for summary judgments "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The government also cites RCFC 12(f) for support. Def.'s Mot. to Strike at 1. RCFC 12(f), however, is inapposite; it permits a party to seek to have "stricken from *any pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." (Emphasis added). Mr. Lubbock's affidavit is not a pleading, and Boston Edison has not sought to have it incorporated into any pleading.

The government also argues that Mr. Lubbock's testimony is inauthentic under Fed. R. Evid. 901. Def.'s Mot. to Strike at 5. This argument is inapposite because Fed. R. Evid. 901 applies only to tangible evidence and not to testimonial evidence. *See, e.g.*, *Cook v. Hoppin*, 783 F.2d 684, 688 (7th Cir. 1986).

Fed. R. Evid. 602 requires that "evidence [be] introduced sufficient to support a finding that the witness has personal knowledge of the matter." A witness is deemed qualified to testify unless no reasonable juror or court "could believe that the witness had the ability and opportunity to perceive the event [about which] he testifies." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). The quality of such perceptions should go towards the testimony's weight rather than its credibility. *Adkins v. Dirickson*, 523 F.Supp. 1281, 1284-85 (E.D. Pa. 1981).

Mr. Lubbock's affidavit meets the inexacting threshold for admissibility under Fed. R. Evid. 602. Mr. Lubbock's oversight of the independent public auctions of Boston Edison's fossil-fuel-fired generating and nuclear facilities and discussions with prospective purchasers of Pilgrim during the due diligence and sale process suggest that he is capable of having perceived tendencies on the part of the buyers. Lubbock Aff. ¶ 3. The government attempts to discredit his testimony by arguing that Lubbock makes an untenable comparison between the auctions of fossil-fuel-fired facilities and nuclear facilities, that continued payments to the Nuclear Waste Fund should not have concerned customers because such fees are passed through to the ratepayers, and that decommissioning of the plant should not begin as early as three years from the sale because Pilgrim was to remain operational for at least thirteen years. Def.'s Mot. to Strike at 4-10. Each of these arguments goes to the weight of the testimony and not to whether the affidavit fails to set forth potentially admissible testimony.

The principal case cited by the government to support its interpretation of Fed. R. Evid. 602 is *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988), in which a dismissed foreman bringing an action under 42 U.S.C. § 1983 justified his assertion of a custom of firing solely for cause with only "one conclusory statement." That court held that in order for Davis to withstand the defendant's motion for summary judgment, he needed to "establish *some* fact in his affidavit which would create a genuine issue" over the material facts in the case. *Id.* at 189. In this case, Mr. Lubbock has asserted several facts that reveal a genuine dispute over whether DOE's actions diminished the facilities' value. Lubbock asserts that at the end of the auction-due-diligence process, only two bidders remained for Pilgrim, while nineteen paid the $15,000 bidders' fee and six submitted final bids for the fossil-fuel-fired facilities being separately auctioned. Lubbock Aff. ¶ 9. By contrast, six of the nineteen submitted final bids for the fossil-fuel-fired facilities. *Id*. Lubbock also claims that during the Pilgrim auction process, the Secretary of DOE announced that facilities would have to pay fees to the Nuclear Waste Fund through at least 2020, regardless of whether a permanent repository would be operational. *Id.* ¶ 6. These facts, as well as his position and frequent meetings with the due-diligence teams, reveal that the Lubbock Affidavit is based on personal knowledge and reflects more than conclusory statements. These circumstances provide a more than ample foundation to maintain the Lubbock Affidavit in the record of the proceedings on the government's motions.

The government also challenges the admissibility of the Lubbock Affidavit under Fed. R. Evid. 701. This rule requires that opinions or inferences in a witness's testimony be (1) rationally based on the perceptions of the witness, (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (3) not based on the types of

expertise covered by Fed. R. Evid. 702. The rule was amended to its present form in 2000 to help "eliminate the risk that a party will circumvent the reliability requirements set forth [in Rule 702] by adducing expert testimony in lay witnesses' clothing." *See DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685-86 (5th Cir. 2003) (citing Fed. R. Evid. 701 advisory committee's note to 2000 amendments).

Boston Edison contends that Mr. Lubbock's affidavit satisfies the three requirements of Fed. R. Evid. 701. It avers that the opinions in his lay testimony are rationally based on his perceptions as Director of Generation Divestiture for Boston Edison, Lubbock Aff. ¶¶ 1-3, and that his statements are helpful to the determination of a material fact, *viz.*, whether the plaintiff suffered damages from DOE's actions. Boston Edison also argues that Mr. Lubbock's observations are not based on scientific or specialized knowledge but rather on his own experiences in auctioning Pilgrim and other electric power generating assets.

The government's argument relies principally on claims that Lubbock fails the first requirement because he lacks personal knowledge of the valuation models used by potential bidders. However, Mr. Lubbock's personal observations and knowledge of the actions of the entities that paid the initial bidders' fee and of the subset that submitted bids serve as a basis for his testimony. The government also relies on *Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), and *DIJO, Inc. v. Hilton Hotels Corp.*, both of which involved materially different circumstances. *Bank of China* held that testimony based only on an experienced Bank of China employee's investigation was admissible, but testimony based on his more general expertise in international banking was not. 359 F.3d at 181-82. By contrast, Mr. Lubbock's testimony is based on his perceptions during his direction of Boston Edison's auction, not on his more generalized experience with NSTAR and Boston Edison. *DIJO* held testimony about a company's lost profits inadmissible when the witness lacked first-hand knowledge about the company and his opinion was based on documents provided to him by the founder of the company. 351 F.3d at 686. In this case, Mr. Lubbock has first-hand, participatory knowledge of the events surrounding the auction of Pilgrim. For these reasons, the government's motion to strike Geoffrey Lubbock's affidavit is denied.

*2. Diminution in Value.*

Boston Edison avers that Pilgrim would have merited a higher sales price if not for the actions of DOE. It emphasizes that initially ten prospective purchasers were interested in pursuing due diligence about Pilgrim, but, after diligence, only two submitted bids. Lubbock Aff. ¶ 9. DOE had stated it would continue to collect fees for the Nuclear Waste Fund through at least 2020, irrespective of whether a permanent facility had been built. *Id.* ¶ 6. The delay in disposal was of particular concern for Pilgrim because it was built to hold only a small amount of spent fuel on-site. *Id.* ¶ 4.

This court may award damages for diminished value as incidental or consequential damages, provided they are not unforeseeable or too remote. Incidental damages include "costs

incurred in a reasonable effort, whether successful or not, to avoid loss." *Restatement (Second) Contracts* §347 cmt. c. Boston Edison claims that its sale of the plant after DOE's alleged breach was an attempt to mitigate its losses. Pl.'s Reply at 15. Consequential losses "include such items as injury to person or property resulting from defective performance." *Restatement (Second) Contracts* § 347 cmt. c. Mitigation is not the only avenue available to Boston Edison for damages. If Boston Edison sold its plant for reasons other than the breach, such as an industry restructuring scheme in Massachusetts mentioned by Mr. Lubbock as one reason for the divestiture of assets, but DOE's actions reduced the value of the facility, Boston Edison could recover the diminution in value as a consequential loss. *See* Lubbock Aff. ¶ 8.

In this latter respect, a special brand of incidental or consequential damages for construction of homes or facilities on property may be instructive by way of analogy to support Boston Edison's recovery of the diminution in value. For an alternative to loss-in-value of performance for construction contracts, the *Restatement (Second) Contracts* posits reference to the diminution in the market price of the property: "If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on (a) the diminution in the market price of the property caused by the breach . . . ." *Restatement (Second) Contracts* § 348(2).[16] Here, Boston Edison seeks to recover the diminution in the value of its own property after a provider of services to the facility did not perform. Nonetheless, the situations are similar in one key respect. Diminution in value is assessed in the construction context when the cost of repairing defective construction far exceeds the loss in value. Of the two alternatives, the more reasonable damage assessment is the diminution in value. *Restatement (Second) Contracts* § 348 cmt. c. In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution in value is left as the appropriate damage assessment.

The government argues that such damages are too remote, speculative, and unforeseeable to be recovered.[17] In contract law, and especially in this court, damages must be directly caused

---

[16]*Restatement (Second) Contracts* § 348(2)(b) provides a further alternative that is not available to Boston Edison, *i.e.*, "the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him."

[17]Boston Edison has moved to strike that portion of the government's opposition that argues the plaintiff's alleged damages are impermissibly consequential in nature. Pl.'s Reply at 2-3. That motion is denied. Boston Edison principally complains that the government is "too late" in making these arguments because they amount to "a transparent expansion of the grounds that it initially put forward for dismissal." *Id*. at 3. The government's arguments constitute a conceptually viable response to the claims of diminution in value raised in Boston Edison's cross-motion for partial summary judgment. At this stage, where standing is at issue, both the

by defendant's breach and not be too remote. *See Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996) ("'[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages.'") (quoting *Northern Helex Co. v. United States*, 524 F.2d 707, 720 (Ct. Cl. 1975)). In the context of lost profits, the Federal Circuit recently held that causation must be directly established, but that the breach need not be the sole cause of the damages. *California Fed. Bank v. United States*, ___ F.3d ___, 2005 WL 95171 at *3, (Fed. Cir. 2005). In this case, causation of damage measured by diminution in value is an issue of fact, to be determined in future proceedings.

The government also contends that damages measured by diminution in value are too speculative. While speculative damages are not recoverable, "'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.'" *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (quoting *Electronic & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358, (Ct. Cl. 1969)). Here, if Boston Edison can prove that DOE's failure of performance under the Standard Contract caused a diminution, a calculation of damages based upon diminution in value might be made.

That damages might arise from diminution in value was foreseeable. That sale of nuclear facilities was contemplated by Congress and by DOE is shown by the existence of the assignment provision of the NWPA, 42 U.S.C. § 10222(b)(3), and by Article XIV of the Standard Contract which provides that "[t]he rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer." Boston Edison complied with the notice requirements and received no objection from DOE. Pl.'s Reply at 14. It is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained from a sale. Such a diminution resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage.

In short, Boston Edison's diminution-in-value claim alleges adequate injury in fact for purposes of standing.

*3. Decommissioning Trust Fund.*

An additional incidental or consequential damage averred by Boston Edison in connection with the sale of Pilgrim involves a decommissioning trust fund. Part of the license-transfer process requires the seller "to transfer a fully decommissioning trust fund (net of expected investment returns to end of license life) to the buyer in order to ensure that it would have sufficient funds to decommission the plant and the surrounding site once the plant could no

---

diminution-in-value theory of damages to supply injury in fact for standing and the remote-damage defense to that theory have potential merit, and there is no basis for a motion to strike.

longer operate." Lubbock Aff. ¶ 13. Because such decommissioning is more expensive when a facility holds more SNF and HLW, Boston Edison alleges it was required to transfer a "much larger" decommissioning trust fund to the buyer than it would have had DOE not breached the Standard Contract. The government does not challenge this claim of an incidental or consequential loss as being legally unavailing, and it would be viable depending upon the proof of causation and loss. This claim also alleges injury in fact flowing from the breach.

*B. Re-racking*

Another form of damages averred by plaintiff is the "re-racking" cost. "Re-racking essentially is removing existing fuel racks [from a pool] and replacing them in a tighter formation so the same pool can accommodate more fuel rods. The newer 'higher density' racks provide additional capacity for fuel assemblies." *Indiana Michigan III*, 60 Fed. Cl. at 643. Re-racking, if proven, is an incidental loss because it would have been done to mitigate Boston Edison's damages due to the breach. In Boston Edison's amended complaint, it averred that it "was required to incur costs in order to accommodate additional on-site SNF storage."[18] Am. Compl. ¶ 71. Boston Edison later clarified that these costs referred to re-racking, among other things. Pl.'s Reply at 2; Hr'g Tr. at 53-55. This re-racking allegedly took place after DOE had indicated it would not dispose of SNF on or before January 31, 1998. Hr'g Tr. at 54. Such a claim also shows that Boston Edison has alleged an injury in fact.

*C. Damages to All Utilities with Standard Contracts*

*1. Resultant injuries.*

Boston Edison argues that certain injuries were suffered by every utility that signed a Standard Contract. Each Standard Contract required the government to begin its services by January 31, 1998, and once that date passed without action, every utility suffered a breach. Hr'g Tr. at 47, 57. Boston Edison argues that the courts should determine the appropriate damages, but that the non-binding DCS process is an inappropriate way to approach proof of damages. Pl.'s Resp. at 20-21. In Boston Edison's view, one reason all utilities' contracts were breached on January 31, 1998 is that the failure to begin disposing of any utility's SNF foreclosed the opportunity to engage in SNF put-option trading under Article V.E of the Standard Contract. Utilities that had the smallest on-site storage capacity would be more willing to pay to move up in the SNF queue. This mechanism allowed market forces to determine which utility's SNF to dispose, provided DOE was given notice six months in advance.

Boston Edison also claims that another damage recoverable by all utilities that participated in the DCS process is the administrative costs of the DCS process. Because no fuel

---

[18]The Amended Complaint incorrectly claims that the plaintiff developed an on-site dry-cask storage facility, a mistake Boston Edison has acknowledged. Pl.'s Resp. to Mot. to Strike at 11.

has been disposed and DOE will likely reinitiate the DCS process once a storage facility is available, *see supra*, at 5-6 n.9, the administrative costs of the DCS process may constitute an additional loss.

As previously noted, calculating the expectancy interest of the injured party contemplates references to three components: (1) the benefit the non-breaching party would have gained but for the breach, (2) other incidental and consequential losses, and (3) the amount saved by the non-breaching party. *Restatement (Second) Contracts* § 347. The third component arguably is not a factor in the present case because the alleged breach is a partial one, and Entergy, Boston Edison's successor in interest, continues to fulfill its obligations under the contract. As explained earlier, the diminution-in-value claim and re-racking claims are a brand of the second component. Nonetheless, the dispute over whether every utility can recover for a breach on and after January 31, 1998 without reference to the DCS process concerns the first component of expectancy damages. The court need not determine the appropriate measure of damages at this point; it suffices to hold that the alleged incidental and consequential losses constitute sufficient injury in fact for Boston Edison to have standing. The court, however, does not share Boston Edison's talismanic view of the January 31, 1998 deadline. The date of the breach is an issue of fact to be determined at trial. The date of the breach may have been in 1997 when the government first suspended the DCS process, or on January 31, 1998, or on a different date not currently before the court.

*2. Collateral estoppel.*

Boston Edison alleges that the government is collaterally estopped from arguing that the breach took place any time other than January 31, 1998. Pl.'s Resp. at 13-21. The pivotal question in applying collateral estoppel principles against the government is whether the same plaintiff is involved in both cases. *Compare United States v. Mendoza*, 464 U.S. 154, 162-63 (1984) (rejecting application of non-mutual offensive collateral estoppel against the government), *with United States v. Stauffer Chem. Co.*, 464 U.S. 165, 173 (1984) (affirming use of mutual defensive collateral estoppel against the government).[19] The party seeking preclusion by collateral estoppel bears the burden of establishing each of the necessary elements. *See Novartis Pharm. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1333 (Fed. Cir. 2004) (applying Third Circuit law); *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (applying Eleventh Circuit law). In short, in suits against the government, a party seeking to estop the government

---

[19]The pivotal difference between *Mendoza* and *Stauffer* in their application to this case is mutuality, not whether the principle is used offensively or defensively. *See Stauffer*, 464 U.S. at 173 (holding that the argument that using collateral estoppel against the government will freeze the development of the law "is persuasive only to prevent the application of collateral estoppel against the government in the absence of mutuality").

from litigating an issue bears the burden of proving mutuality.[20] In this case, the government disputes, among other things, that the plaintiff was a party to this prior litigation. *See* Def.'s Reply at 13 (noting that the cases cited by Boston Edison "involve[d] . . . separate parties"). Boston Edison has not controverted this assertion, and thus it has failed to establish its burden of proof. The court rejects Boston Edison's collateral estoppel claim unless it shows in future proceedings that it was a party in a case where the date of breach was a critical and necessary element of the judgment.

*D. Synopsis Regarding Standing*

Alleged incidental and consequential damages consisting of diminution in value (including the alleged excessive size of the decommissioning trust fund), re-racking expenses, the inability to engage in SNF put-option trading, and the administrative costs of duplicative DCS processes are sufficient to forestall a motion to dismiss based on standing. Boston Edison has shown that it suffered injury in fact resulting from the government's alleged breach of the Standard Contract, and thus that it has standing to pursue its contractual claim.

*GOOD FAITH AND FAIR DEALING*

The government has also moved to dismiss for failure to state a claim, or for summary judgment, on Boston Edison's count in its Amended Complaint that the government breached the implied covenant of good faith and fair dealing in its actions on the Standard Contract. Def.'s Mot. to Dismiss at 33-36 (addressing Count II of the Am. Compl.). The government argues that Boston Edison has not satisfied its burden to establish a *prima facie* case for the elements of such a claim.

Government officials are presumed to act in good faith, and plaintiff must show clear and convincing evidence to overcome this presumption. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). While this standard is difficult to meet, "difficult is not the same as impossible." *Southern Cal. Edison*, 58 Fed. Cl. at 325. *See also Hubbard v. United States*, 52 Fed. Cl. 192, 196 (2002) (finding that the evidence presented at trial demonstrated that the government acted in bad faith). One obligation imposed by the covenant is "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. & CTX Holding Co. v. United States*, __ F.3d __, 2005 WL 95687, at *18 (Fed. Cir. 2005). This implied covenant prevents the government from

[20]The *Mendoza* decision preserved one exception to the mutuality requirement created by *Nevada v. United States*, 463 U.S. 110 (1983), where the Court applied res judicata against the United States as to one class of claimants who were not parties to the prior adjudication because that litigation involved "'a comprehensive adjudication of water rights intended to settle once and for all the question of how much of the Truckee River each of the litigants was entitled to.'" *Mendoza*, 464 U.S. at 163 n.8 (quoting *Nevada*, 463 U.S. at 143). None of the prior adjudications in spent nuclear fuel cases was meant to be similarly comprehensive.

targeting its contracting partners' reasonable expectations. *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997) ("The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties."); *see also Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550, 560-61 (2004).

Boston Edison alleges that, as early as 1987, DOE knew it would be unable to begin disposing of SNF by January 31, 1998, but DOE continued with the paper planning aspects of the contract. Pl.'s Resp. at 45. Throughout the ensuing delay, DOE has not offered contracting utilities a disposal facility of any kind, including a temporary storage location. Instead, the government has triggered the planning process under the Standard Contract several times, only to suspend that process for lengthy periods while it addressed its options. The government offers several excuses for its behavior, which excuses boil down to a recitation of temporizing directions by Congress. For example, the government argues that the reason a Monitored Retrieval Storage facility, which would have been a temporary solution, was never opened is because Congress did not remove the statutory link between the construction of a repository and the operation of a temporary facility. Def.'s Reply at 39 n. 22. While DOE's actions may have been engendered by Congress's decisions, the Federal Circuit's recent decision in *Centex* teaches that actions both of Congress and of the agency, here the Department of Energy, may be pertinent to a breach of the implied covenant. In *Centex*, the plaintiffs claimed that a congressional act known as the Guarini Amendment, which disallowed institutions that were acquiring failed thrifts from claiming certain tax deductions, nullified an important part of their consideration under their agreements with the government. *Centex*, ___ F.3d at ___, 2005 WL 95687 at *2-3. The Federal Circuit upheld the trial court's decision that an act of Congress breached the implied covenant of good faith and fair dealing. *Id.* at *25.

An inquiry into whether the government is liable for breach of contract based upon acts of Congress as well as on agency actions is inherently case-specific. *Yankee Atomic*, 112 F.3d at 1575. Boston Edison has alleged facts that, if proved, would make out a viable claim for relief under these implied covenants, and it has supported these allegations with detailed facts showing at least a conscious disregard at times by the government of circumstances that have prevented performance.[21] At this point, the record is inadequate to conclude as a matter of law whether or not the government has breached its implied covenant of good faith and fair dealing. The government's motion for summary judgment on Boston Edison's claim for breach of the implied covenant of good faith and fair dealing is denied.

---

[21]Among other things, the government has persisted in urging in this court that it has an obligation to accept and dispose of SNF and HLW only if an appropriate repository is available, notwithstanding the D.C. Circuit's grant of a writ of mandamus in November 1997 "precluding DOE from exercising its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Northern States I*, 128 F.3d at 761.

*TAKINGS CLAIM*

Boston Edison also claims that the Department of Energy's failure to dispose of its SNF constituted a taking without just compensation because it was forced to store the SNF on its premises. Am. Compl. ¶¶ 82-83; Pl.'s Resp. at 30. Boston Edison alleges that DOE's actions effected both a *per se* taking and a regulatory taking. *See* Pl.'s Resp. at 30-32. The government has moved for summary judgment, arguing that all of Boston Edison's rights were derived from the Standard Contract. Def.'s Mot. to Dismiss at 27-33. As the government would have it, a plaintiff cannot recover damages under a takings theory when the right taken was created solely by a voluntarily-entered contract and the plaintiff could recover its damages under a breach-of-contract theory. *Id*. at 29-30 (citing *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002); *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)). Boston Edison has argued that the rights taken do not derive from the Standard Contract, but rather from the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2297g-4, that the Standard Contract was not voluntary, and that some of the remedies it is pursuing may be unavailable under a breach-of-contract theory. Pl.'s Resp. at 27–37. Because the parties dispute issues of material fact, the government's motion for summary judgment is denied.

Several genuine issues of material fact have emerged. First, the origin of plaintiff's rights is in dispute. Plaintiff argues that the right to removal of its SNF by the government existed prior to the Standard Contract, while the government argues those rights derived from the Standard Contract itself. Pl.'s Resp. at 27-30; Def.'s Reply at 20-23.[22] Second, the parties dispute whether the right allegedly taken was a property right or a contractual right. Pl.'s Resp. at 36-37; Def.'s Mot. to Dismiss at 30-33. Third, the voluntariness of the contract is in dispute. *See* Pl.'s Resp. at 32-34. Fourth, the parties dispute the reasonableness of the parties' expectations at issue under the legal framework for a regulatory taking claim. *See* Pl.'s Resp. at 32; Def.'s Reply at 26-28. Given that the standard for determining whether a regulatory taking has occurred is both case-specific and fact-intensive, developing a more comprehensive record is particularly important to resolve this dispute. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 336-37, 342 (2002); *Cienega Gardens v. United States*, 331 F.3d 1319, 1345, 1354-55 (Fed. Cir. 2003); *Chancellor Manor v. United States*, 331 F.3d 891, 904-06 (Fed. Cir. 2003).

---

[22]The government relies in part on *Nuclear Energy*, 373 F.3d at 1286-89 to show that plaintiff's right to disposal derives from the Standard Contract. Def.'s Reply at 21-22. The issue in *Nuclear Energy* was whether the Nuclear Regulatory Commission promulgated its licensing criteria under the NWPA or under other relevant law. The court held that, although Congress may have authorized the NRC to regulate DOE's disposal of radioactive waste prior to NWPA, that does not mean that its later regulations were not issued pursuant to the NWPA. *Nuclear Energy*, 373 F.3d at 1288. This issue is not the same as whether or not the nuclear facilities had a right to disposal of their SNF and HLW prior to the passage of the NWPA. As a matter of logic, that NWPA may have altered a pre-existing right of Boston Edison does not mean that the right taken was created solely by the Standard Contract.

Boston Edison may bring contract and taking claims concurrently, but, if both claims remain viable, recovery under the contract damages theory is appropriate. *See Cienega Gardens*, 331 F.3d at 1334 ("the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, [such as banking], because the contracts embodied the commitments of the contracting parties"); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (suggesting a taking claim as an alternative to a suit for damages for the government's failure to vacate at the end of a lease); *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34-35 (1998) ("defendant's motion does not preclude plaintiff from pleading a taking claim and breach of contract claim in the alternative"). Both claims are currently viable, but a more complete record is necessary to determine if either theory would allow recovery.

This court has denied motions to dismiss in this context to allow development of a more complete record. *See Detroit Edison*, 56 Fed. Cl. at 302-03 ("[A] more fully developed record will allow the court to assess whether the property right implicated in plaintiff's takings claim falls outside the rights granted under the Standard Contract."); *Yankee Atomic*, 42 Fed. Cl. at 236 ("plaintiff's taking claim is not converted into a claim arising under the contract and subject to the disputes clause"). The same treatment is appropriate on summary judgment when material facts are in dispute. For these reasons, the government's motion for summary judgment on Boston Edison's taking claim is denied.

*PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

Boston Edison seeks summary judgment against the government on the issue of liability for breach of contract. Pl.'s Resp. at 46-49. The government argues that Boston Edison has failed to show that it has suffered any damages. Def.'s Reply at 42. Boston Edison is required to show that it has suffered some damages in order to be granted judgment on liability. *See Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (1971) ("there must be *some* evidence of damage to support a finding on liability . . . . [I]t is only sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred."). As described above, *see supra* at 14-23, that showing has been made, even taking into account the fact that there is a genuine dispute of material fact over when the breach occurred. However, because the time of the breach has yet not been established, this court exercises its discretion to deny Boston Edison's motion for partial summary judgment at this stage of the proceedings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (the trial court has discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial").

## CONCLUSION

For the reasons stated, the government's motion to dismiss plaintiff's first two counts is DENIED, and its motion for summary judgment on all three counts is DENIED, as is its motion to strike the affidavit of Geoffrey Lubbock. Plaintiff's motion to strike portions of the government's briefing addressing consequential damages is DENIED, as is its motion for

summary judgment. Trial proceedings are appropriate to determine the date of the breach and what injury and damages Boston Edison suffered as a consequence of the breach.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge