# UNITED STATES
# COURT OF FEDERAL CLAIMS

```
DELMARVA POWER &               )
LIGHT CO.,                     )
                               )
               Plaintiff,      )
                               )
          v.                   )
                               )
THE UNITED STATES,             )
                               )
               Defendant.      )
-------------------------------)  Docket No. 04-34C
ATLANTIC CITY ELECTRIC         )            04-36C
CO.,                           )
                               )
               Plaintiff,      )
                               )
          v.                   )
                               )
THE UNITED STATES,             )
                               )
               Defendant.      )
```

Pages: 1 through 73

Place: Washington, D.C.

Date: June 28, 2005

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DELMARVA POWER & LIGHT CO., )
Plaintiff, )
v. )
THE UNITED STATES, )
Defendant. )
------------------------------) Docket No. 04-34C
ATLANTIC CITY ELECTRIC CO., ) 04-36C
Plaintiff, )
v. )
THE UNITED STATES, )
Defendant. )

Room 512, Courtroom 8
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Tuesday
June 28, 2005

The parties met, pursuant to notice of the Court, at 2:00 p.m.

BEFORE: HONORABLE CHRISTINE ODELL COOK MILLER
Judge

APPEARANCES:

For the Plaintiff:

RICHARD J. CONWAY, Esquire
NICHOLAS W. MATTIA, JR., Esquire
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, D.C. 20037-1526
(202) 828-2235 / (202) 833-7035

APPEARANCES (CONT'D)

For the Defendant:

JOHN C. EKMAN, Esquire
HAROLD LESTER, Esquire
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0897

P R O C E E D I N G S

(2:00 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Christine Odell Cook Miller presiding. God bless this honorable Court.

Calling the consolidated cases of Delmarva Power & Light Company v. United States, Case No. 04-34C, and Atlantic City Electric Company v. United States, Case No. 04-36C, for argument on Defendant's motion for summary judgment.

THE COURT: Good afternoon, everybody. Please be seated.

MR. CONWAY: Good afternoon, Your Honor.

THE COURT: Good to see you, Mr. Conway. how are you today?

MR. CONWAY: I'm fine, Your Honor. Thank you.

THE COURT: And Mr. Mattia is here?

MR. CONWAY: Mr. Mattia is right here, Your Honor.

MR. MATTIA: Yes.

THE COURT: Mattia. I should pronounce it right by now.

MR. MATTIA: It's been Mattia all my life,

Your Honor.
THE COURT: Well, Mattia will be fine; that's the way it should be pronounced.
And Mr. Goodman. How are you today? Good to see you.
MR. GOODMAN: Fine, Your Honor.
THE COURT: Mr. Lester, how are you?
MR. LESTER: Just fine, Your Honor. How are you?
THE COURT: And Mr. Ekman will be doing the arguing today?
MR. LESTER: Yes, he will.
THE COURT: How are you, Mr. Ekman?
MR. EKMAN: I'm well. Thank you, Your Honor.
THE COURT: I didn't know Mr. Lester was getting shy. Did he warn you what you'd be up against?
MR. EKMAN: I was -- I was actually present --
THE COURT: I know. I'm kidding you. No, I'm always glad to see Mr. Lester. They just assign him cases that are -- shall we say are difficult to be brought, and it helps -- it helps bringing these various positions that such a fine counsel as Mr.

Lester is here as well as yourself because if it was someone else, I don't know if I'd have as much patience.

So, Mr. Ekman, you've filed a renewed motion that contained no surprises. Have at it.

MR. EKMAN: Thank you, Your Honor.

THE COURT: Now what's going to happen first, the end of the SNF cases or the disposition of the spent nuclear fuel?

MR. EKMAN: I -- I would not want to hazard a guess on that, Your Honor.

THE COURT: If you predicted that, I was going to say you won, so you're starting off on the wrong foot, but go ahead. Well, you're doing your best to end them.

MR. EKMAN: We are, Your Honor. We -- We're trying. We're trying.

May it please the Court. We're here today, as Your Honor knows, on our motion for summary judgment concerning the two claims that were brought by the Plaintiffs. One is -- is their protected breach of contract claim which was brought, as Your Honor may recall, on the eve of the December 3rd hearing. The second, of course, is the takings claim which we presented in a motion to dismiss and have now

re-presented based upon a record that we've submitted, as well as based upon a couple recent decisions, one by the Federal Circuit in Stearns in January of 2005. The second is Lingle v. Chevron, which was a case the Supreme Court decided roughly four weeks ago, both of which are cited in our -- in our briefs, and those are new since the -- since the argument on December 3rd.

What I'd like to do is start with the takings claim and then move to the breach of contract claim and then talk -- and talk about the damages component of that and conclude to the extent Your Honor wants discussion about it, I -- I just have a brief comment on the motion to strike, which -- which is also pending before Your Honor.

THE COURT: Well, proceed.

MR. EKMAN: All right. Excellent.

Your Honor, as this Court held in Members of the Peanut Quota Holders Association v. U.S., in analyzing the takings claim --

THE COURT: That hasn't been ruled on. On appeal, I mean.

MR. EKMAN: On appeal, it has not. That's correct.

THE COURT: But it was a brilliant decision as long as it lasts, right?

MR. EKMAN: Well, the reason I'm citing to that case is I think that the two premises that I'm citing are well established, that in analyzing a takings claim, this Court found that you first of all must consider the nature of the interest that's alleged to determine whether a compensable property interest actually exists and then you get to the second step if you determine a compensable property interest does exist and that is whether the government's action constitutes a compensable taking of that interest for a public purpose.

Now the difficulty that I have, Your Honor, with the Plaintiffs' claims here is that despite the repeated briefing and argument not only in this case but in others, it is still unclear as to what the property interest is that the Plaintiffs seek to vindicate in this case.

Additionally, Plaintiffs have failed to succinctly define the government action that allegedly affected the taking of their property interest.

Over the course of this case, Plaintiffs have identified three separate alleged a property rights. First, the Plaintiffs in their complaint allege property interest in the standard contract, that is, in the contractual obligation of the

government to dispose of spent nuclear fuel. Second, they have -- they have identified an alleged property interest emanating from the Nuclear Waste Policy Act in what they call, and I'm quoting, "a decades-long statutory framework" that purportedly dates all the way back to the Atomic Energy Act. And then finally, Plaintiffs have pled a property interest in the physical plant, alleging that that plant was sold or that their interest in that plant was sold at a depreciated value as a result of the actions of the government.

In response to the first alleged property right, and I'll -- I'll be brief on this, that is, a property interest in the standard contract, courts have consistently rejected takings claims that are founded upon a breach of contract, and these are well cited in our briefs, including U.S. v. Winstar, a Supreme Court Case; Castle v. U.S.; in the spent fuel cases, Commonwealth Edison.

More recently, in Canal Electric, this Court, Judge Hodges, rejected a takings claim that was founded upon property rights in the standard contract. Now that case is identical to these cases brought -- it was a case brought by a minority interest holder. It was actually brought by -- Canal

was represented by the attorneys that represent -- by Mr. Conway.

Judge Hodges dismissed that takings claim on the grounds that it was based entirely upon rights set forth in the standard contract. Specifically, the Court in Canal held, "Absent the contract, Plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim."

Also, in mid-May, in Zoeller v. U.S., this Court dismissed a takings claim that was also founded on a breach of contract, holding that the Plaintiffs' claim for damages and the right to remove his perennials, which were on the leased property, arose out of the termination of a lease agreement and that, and I quote, "The government has not prevented the Plaintiff from seeking contractual remedies for losses related to the partial termination, including damages for the destroyed plants."

And I would reference Your Honor obviously to the cases we cited, including the discussion in Castle and Judge Scalia's concurring opinion in Winstar.

Your Honor, to the extent Plaintiffs' claims are based upon alleged property rights that they

believe they have in the standard contract, a judgment should enter in the government's favor on that takings claim.

THE COURT: What is the difference between this case at this point and the case that I ruled on, Detroit Edison? That, of course, was a motion to dismiss.

MR. EKMAN: Well, first of all, Detroit Edison was issued without the benefit of some of the more recent decisions, both of the Supreme Court and the Federal Circuit. In Detroit Edison -- and I actually read that right before I came over here --

THE COURT: I hope so.

MR. EKMAN: I anticipated you'd ask me about it. In Detroit Edison, this Court actually I think agreed with the premise that property rights cannot exist in a contract. Your Honor let the --

THE COURT: Well, they have to be grounded -- they have to be grounded elsewhere even though there may be a contract in play.

MR. EKMAN: Well, and as I understand what Your Honor did, and, again, this is my understanding of it, you allowed that to continue to determine what the basis of the property rights was. However, you did note that to the extent that a takings claim was

allowed to proceed, right at the end of the order actually, you did note that you were not going to allow the takings claim to impact the kind of damages that the Plaintiffs could get in that case. In fact, Your Honor stated that they would be limited -- no, you know, under a takings claim, for example, prejudgment interest --

THE COURT: Right.

MR. EKMAN: -- would be available. And in that case, you said that you weren't going to allow them to use a takings claim to expand remedies that would otherwise be available in a breach of contract case.

You know, I think -- I think here, and again, based upon -- to the extent this is based on the standard contract, I think it's quite clear that -- that those cases -- that this case needs to be -- judgment needs to enter on those claims.

Now, there is the -- there is a question of the physical property, which I -- which I do want to address separately, and I don't know what was argued in Detroit Edison ultimately and -- or what Plaintiffs had argued. Obviously, there's been quite a significant amount of briefing and this is a summary judgment motion --

THE COURT: No, I --

MR. EKMAN: -- so we do have --

THE COURT: That's why I mentioned it.

MR. EKMAN: Yes. So we do have a record that we've submitted and I'm not sure that -- I believe that judgment can enter on the physical takings claim as well.

Prior to doing that, I do want to briefly discuss the statutory claim, this -- this assertion of property interest in the Nuclear Waste Policy Act or in the Atomic Energy Act or in this decades-long statutory framework.

Your Honor, courts have repeatedly held that a Plaintiff does not possess a property interest in a statute. For example -- again, we cite numerous cases. I just want to cite a few: Adams v. United States, where the Federal Circuit in 2004 rejected the plaintiff's contention that they had a protected property interest in the Fair Labor Standards Act.

In Branch v. U.S., which was a Federal Circuit decision in '96, the Federal Circuit rejected a takings claim, holding a legislature is free to make statutory changes to the common law rules of liability without running afoul of the 5th or 14th Amendment protections of property. The reason, the Supreme

Court has explained, is that no one is considered to have a property interest in the rule of law, and it goes on to note, I think truthfully, that to treat every statutory change in the rules of liability as a taking would cripple the ability of federal and state legislatures to adjust the benefits and burdens of economic life.

And I would also note that this Court in Peanut Quota found that because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the 5th Amendment.

Your Honor, not only do the Plaintiffs not possess a property interest in any statute, they have failed to identify any specific provision of the Nuclear Waste Policy Act or any other statute or regulation that creates an alleged property interest in the government's acceptance of spent nuclear fuel or that creates an obligation on the government's part to even begin acceptance at any particular date or without compensation from the Plaintiffs.

Plaintiffs do argue in their brief -- they make this statement, "The government's actions also amounted to a regulatory taking of Delmarva's and Atlantic City's property interest as a direct result

of the government's failure to abide by its obligations under the Nuclear Waste Policy Act." But the problem with that argument is the government has no obligations under the Nuclear Waste Policy Act. It is not a self-executing act. Instead, it authorized the Department of Energy, the Secretary, to enter into contracts and it's through those contracts that give the government a contractual obligation to begin the acceptance of spent fuel by January 31, 1998. And again, that argument doesn't change the fact that, at base, it relies upon a property interest in a statute which simply doesn't exist.

THE COURT: What about -- your view would be to the extent that the statute authorized a property interest, then the property interest -- through a contract, then -- then once again we're talking about rights created by a contract.

MR. EKMAN: That's right. And, you know, we have never contended in this case that the Plaintiffs wouldn't possess a breach of contract claim. There are separate reasons why they don't, and that's because they've assigned their claim. They sold their claims to -- to PECO, now Exelon, and to PSEG, but the government hasn't taken their right to seek contract damages. They have that right or at least they had

that right before they assigned those claims --

THE COURT: No --

MR. EKMAN: -- and those claims are now being prosecuted.

THE COURT: -- they still have that right until you make up your mind what your position is vis-à-vis the validity of that assignment. Until you make a decision, they've got that right.

MR. EKMAN: All right. And --

THE COURT: Otherwise, the government could come against them on the statute of limitations when you come to your moment of clarity as to who has what rights in this case.

MR. EKMAN: Well, and actually, let -- since Your Honor brings it up, let me -- let me talk about that just briefly. This is again the motion to the extent were talking about the protected -- what they call the protected contract action.

THE COURT: I don't know what else they could call it, given the government's position.

MR. EKMAN: No, I understand that, but the -- the issue is that there is a -- there is a procedure that exists, Rule 17(a), in the rules of procedure, that allow an assignor, in this case, these Plaintiffs, in the event of a successful challenge of

an assignment to be substituted in the place of the assignee in that litigation, and they are treated -- for the purposes of statute of limitations, I believe we cite Systems Fuels for that --

THE COURT: Uh-huh.

MR. EKMAN: -- although I think it's pretty clear in the rule they are substituted in as if they filed the complaint that was filed by the assignee. So statute of limitations issues don't exist.

So, in other words -- and, remember, it only comes into play if we (a) challenge the assignment and then (b) are successful and we have to prevail in that challenge and --

THE COURT: Well, in the meantime, Plaintiffs that -- wanted to bring a timely takings claim, too, and so given the way this was all afloat and the resistance to joining the two actions, which I think would have been the better course until you made up your mind what position you were taking, then it's understandable that Plaintiffs expanded their complaint in that manner.

I don't know why these two cases aren't together. I mean, it's -- One thing that I will want you to address is, you know, assuming we do proceed in this case, on one or both claims, it doesn't matter,

but assuming we -- we were to proceed, what your position is vis-à-vis the status of the request for interlocutory appeal on the PECO case and the PSEG case, I guess PECO/PSEG, whatever it's called.

MR. EKMAN: By that, are you talking about the -- Judge Sypolt's show cause?

THE COURT: Right. I don't know if they'll take it, but whether they do or they don't, you know, what we do next, putting aside whatever action is taken, so assume that issue is on appeal, what your druthers would be.

MR. EKMAN: Well, I -- you know, certainly from a -- from a consolidation, I don't think the government has ever opposed this idea that, you know, to the extent these claims are allowed to go forward that the claims of PSEG -- obviously, you know, Exelon has been settled, you know, and the government settled those claims with the understanding that they had the rights to pursue all of the damages claims.

You know, we believe certainly from a damages perspective that there are serious concerns arising out of this case about duplicative damages unless paying --

THE COURT: Well, at first, I was sympathetic about it, but I think Plaintiffs have done

everything possible to allay your concerns if you'd just decide what you're going to litigate and with whom.

MR. EKMAN: Well, even in the diminution situation, the Plaintiffs have contended that that's not double damages, but in fact PSEG is suing us for the long-term storage costs that they're alleging, the additional costs that they're alleging that they've incurred. The premise, as I understand the Plaintiffs' claim, is that it was those long-term storage costs and the possibility of those costs that drove down the value of their facility; thereby, PSEG paid less than the facility was actually worth.

THE COURT: Right.

MR. EKMAN: Well, if we make PSEG whole, if we're ordered by the Court to make PSEG whole for its future storage costs, we -- once those are paid, presumably the value of the facility will go back up because now you've removed the thing that the Plaintiffs alleged diminished the value. So, even under that circumstance, there is a serious concern that we're going to be double paying.

THE COURT: That you won't have to worry about. If the case ever gets in that posture, they're going to come together.

MR. EKMAN: All right. And certainly consolidation -- I -- we haven't -- we have talked about consolidation, I know, before with Your Honor and certainly that's something that -- that we would need to talk about to the extent this is going forward, but I don't think the government has ever taken the position that we'd oppose it. In fact, I think that we would take the position that we-- we would support a consolidation again to try to avoid duplicative damages.

THE COURT: Well, my view right now, and I'll, you know, see what Plaintiff thinks because if this goes forward I don't want Plaintiff to feel they're expending resources that they would choose not to expend at this time, but I-- my view is that if the case goes forward, it's just going forward, we're just going to get ready for trial. This will be the end of dispositive motions, unless they're successful in whole or part. So -- and then PSEG can catch up with us, and the cases will have to at some point move along together. You know, there's been some resistance to do so, but because of the concerns you mentioned, you're going to have go in front of one judge at some point.

And -- so we'll just see what happens. I

have no inclination as to what the Federal Circuit will do, but they -- they understand now that it only really affects one case, so I think that may bear on it.

But anyway, I interrupted you in the middle of while you're -- you were just getting ready to talk about the physical takings claim.

MR. EKMAN: Yes. Yes.

THE COURT: And then move back to contracts --

MR. EKMAN: Well, you know, I think -- I think we've probably talked about the -- the contract. Like I'll -- you know --

THE COURT: That's fine.

MR. EKMAN: I would like to talk briefly about the damages component because that was briefed, and it is an important issue, but let me -- let me talk about the physical takings issue.

The Plaintiffs have identified a physical -- -- a real property interest in their -- in their physical plant. You know, I don't find it particularly controversial that the Plaintiffs have a property interest in the nuclear facilities in which they were owners. Again, that's based upon our understanding of their claims, accepting their

representations as to their interests as being true. Obviously, we haven't had any discovery on that, but, obviously, plaintiffs in general have property interests in property they own. That's not controversial.

So, with that said, the question of whether there's been a taking, a compensable taking, turns on the second question that this Court identified in the Peanut Quota decision and that is the nature of the government's actions that purportedly form the basis for that taking.

As Your Honor knows, there's two -- there are two types of takings. There's physical takings and regulatory takings, and based upon my interpretation of Plaintiffs' brief, I think they allege both physical and regulatory takings.

I want to start with the question of whether the Plaintiffs can, as a matter of law, pursue a physical takings claim.

Earlier this year -- and this is the January 2005 decision by the Federal Circuit in Stearns, 396 F.3d 1354 -- the Federal Circuit rejected the argument that anything less than a physical invasion of the property by the government could constitute a taking. In rejecting plaintiffs' taking in that case,

the Federal Circuit found that the government had neither (1) occupied Appellee's mineral property or the accompanying implied appurtenant easement or (2) had required the Appellee to accept the physical presence of a third party on any of the property.

Now this is consistent with the prior precedent from the Supreme Court and the Federal Circuit, including the cases cited by Plaintiffs such as Kimball, Kimball Laundry, Pee Wee Coal. Both of those --

THE COURT: But neither of those two situations addressed deals with the notion not of accepting a third party but what about accepting a res that the property is burdened with?

MR. EKMAN: Well, which gets more to the Loretto and Kaiser Aetna concept. Again, it's -- it's -- I think -- I think in looking at the undisputed facts, we find the answer to that question, and the undisputed facts are this. The spent nuclear fuel that is on the Plaintiffs' reactor sites is not the property of the federal government, and it is not the property of third parties. It is the Plaintiffs' property.

And as evidenced by the purchase agreement which we attached to our appendix, the purchase

agreement actually contains a provision that transfers the ownership of the fuel that's contained in the reactor core, that is, the fresh fuel assemblies that are placed in that actually ultimately generate the energy, that is the property of the Plaintiffs, and the spent nuclear fuel that's generated as a result of the energy generation process is also the property of the Plaintiffs.

In fact, it's interesting, the Plaintiffs can't even allege that had DOE performed, they'd have no spent fuel on their site. They would. It's just a natural by-product of what they're doing. All the Plaintiffs can allege in this case is that because of the government's breach of contract they have been required to store certain quantities of spent nuclear fuel that belongs to them on their property for a longer period of time than they argue would otherwise be contractually mandated, you know, and unlike the facts in Kimball Laundry, which I think Your Honor is right in distinguishing, you know, the government has not nationalized the Plaintiffs' business. That's Kimball Laundry and Pee Wee Coal. Indeed, the nuclear facilities once owned in which the Plaintiffs once had a minority interest operated for the Plaintiffs' profits at all relevant times, there's no allegation

that it didn't, and continue to operate for the benefit of its owners today.

Since the government has not physically occupied that property or had -- or forced them to accept the occupation of a third party, Plaintiffs' physical taking claim fails as a matter of law. And, again, we would cite to Stearns as well as the other cases that we -- that we have cited to.

THE COURT: I must say that in the argument on the Peanut Quota case, I was told by the clerks that I sent to observe it that the Federal Circuit was really intrigued as to why there was no default breach of contract claim.

MR. EKMAN: In that case? I don't recall there being a contract in that case.

THE COURT: Well, there wasn't.

MR. EKMAN: Yes.

THE COURT: It didn't bother -- it was a implied in fact contract that was implied during oral argument.

MR. EKMAN: Well, and, you know, again, as Your Honor knows, that was a -- that was an alleged takings case, so --

THE COURT: Well, I know. That's how I addressed it because that's how it was presented and

argued, but, as I said, there was a level of curiosity manifesting about a contract.

MR. EKMAN: Well and here, I mean, again, the concept that there's a breach claim that could be out there is hardly difficult to imagine. I mean, again, our obligation to even remove their spent nuclear fuel from their property is a subject of contract and so --

THE COURT: Well, that you've breached.

MR. EKMAN: That we breached, yes, and that we are liable for in breach but not in taking. And, again, the fact that the Plaintiffs have assigned their breach claim may affect their ability to proceed on a breach claim, but --

THE COURT: Well, you start changing your litigation position in PSEG, and I'll have these Plaintiffs join in that case, but until you do so, I've got problems. I don't want to leave them out there.

MR. EKMAN: Well, and whether or not PSEG proceeds or not, I think, is a separate question from whether the Plaintiffs have asserted a cognizable takings claim or --

THE COURT: Well, I think given the catch-22 you've put them in, I somewhat sympathize with their

position because you should be taking the view that whatever problem exists is between the government and PSEG, and then they can intervene properly in that case and sort out whatever needs to be sorted out.

MR. EKMAN: Well, or -- again, or not, and the way a potential challenge, again, a challenge that has to be successful on the assignment -- as Your Honor knows, Judge Lettow in Rochester Gas --

THE COURT: Lettow.

MR. EKMAN: Lettow. I'm sorry. My bad. He rejected the government's assignment argument in that case, so --

THE COURT: Well, I, you know, think that that's the way things may well go. So -- I just think the cases should be together, just for the reason that -- although I believe one of the two parties should go forward, it's just a question of making sure there's no double recovery and a mechanism if there is one that exists between the two to take care of any differential that one or the other party suffered as a result of the breach.

MR. EKMAN: Well --

THE COURT: But, you know, since we can't seem to work it out among the three involved -- well, I guess four counting standard parties -- the cases

will remain split. I'm not going to join -- or insist that Plaintiffs join with respect to a case that may be stayed for purposes of a jurisdictional determination in any event at this point.

But -- well, I think I understand your arguments. Do you want to reserve some time for a response?

MR. EKMAN: Sure. Would Your Honor like to hear any argument on the -- again, there is the regulatory issue in Lingle which I think is well briefed. I do think Your Honor's comments, though, I do think there's a question, though, as to what claim would be allowed to proceed. Again, I think that the takings claim rises or falls independently of the government's position about a contract assignment in PSEG. That would seem to me to relate more to the breach claim than to the takings claim, which, again, we don't believe they have -- have an ability to pursue in this case because the contracts -- their rights all either emanate -- all emanate from the standard contract, even those that -- even those that they allege affect their real property, the real property interest that they allege.

I'd be happy to defer the argument on the -- on the damages component of the breach claim, this is

the -- or make it, if Your Honor would like. Whatever Your Honor prefers.

THE COURT: Well, I think I understand that because I've seen it in other cases, but whatever you want.

MR. EKMAN: Well, that's fine. I can -- I can wait and rebut. I would add on the motion to strike, though, you know, I do want to say that I think is --

THE COURT: I don't think this material is that important, and I've seen it in other cases. I don't think it does any harm, it's not pivotal. I -- I wouldn't be inclined to strike it. It's relevant historical information. It's in the record, the legislative record.

MR. EKMAN: Yes. I just want to make it clear why we do it and, actually, I think the Plaintiffs' response makes it clear. The Plaintiffs actually comment that this material has been, I circled the quote, "Have conceded as much that articles have been submitted as evidence in prior SNF proceedings for identical purposes with nary an objection from the government."

You know, as Your Honor certainly can appreciate, you know, the actions that we take and the

statements that we make in cases does have an effect, and Plaintiffs obviously cite that. We challenged these because in fact in our trials, I was involved in the Indiana Michigan trial as well as the Yankee trial, we have challenged newspaper articles, we have objected to those articles on hearsay, and we've prevailed on many of those objections.

Additionally, we have objected to industry documents under the hearsay rule and again have prevailed. To the extent that we have not prevailed, it's been over our objections. So, you know, it is important that we try to maintain consistent positions in these cases for fear that, you know, at a trial, somebody says well, you know, this newspaper article was introduced at a prior and the government didn't object.

THE COURT: I don't think the admission for purposes of summary judgment is -- is really quite the same in terms of raising a genuine issue. Interestingly, there's Federal Circuit decisions on it, decisional on both sides, but the idea that you would let the opportunity go for this purpose wouldn't bind you at trial anyway. I'm glad you're cautious. We'd never want to see the government take inconsistent positions.

But thank you. I understand your initial position and we'll see what Mr. Conway has to say.

MR. EKMAN: All right. Thank you.

MR. CONWAY: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. CONWAY: May it please the Court. Let me start with a few comments just on the contract issue, and I'll get that out of the way.

We indicate in our brief on I think pages 8 and 9 our view of the contract matter, and we -- we indicate to the -- to the Court that if the -- if the government is -- is willing to -- if the government's willing to concede that they're not going to bring this issue having to do with assignment, we'll drop the -- we'll drop the pressure counts. We say on page 8, "The government has never stated that it would refrain from raising the same challenges to the assignment provisions in the asset purchase and sale agreements for the nuclear stations. To the extent that the government is willing to make such a concession, Delmarva and Atlantic would be willing to dismiss the breach claims in the amended complaints." We say it on pages 8 and 9 in our footnote, Your Honor.

And our point simply is this, that if the

government -- the government has raised these issues in Rochester. We have noted -- we consider ourselves to be in a catch-22. We consider what the government is trying to do to us is they're trying to say that we have no contract rights and we have no takings rights and then once that's done, they're going to move in the other cases where the buyers are and say that they have no rights because the assignments are invalid, void ab initio, and then nobody's got any rights.

And that was the conundrum we faced when we saw the Rochester Gas arguments and they've made it other places and we simply want the Court to be aware these are protective filings on the breach counts, and when there's a final disposition, and we believe, consistent with Rochester Gas, we'll withdraw those.

THE COURT: Now I've got a question which is, in your view, does Rule 17(a) completely protect you?

MR. CONWAY: I don't think Rule 17(a) completely protects me, but anticipating those kinds of questions --

THE COURT: Go ahead. I'm sitting in a chair for a dwarf, and I'm -- I can't -- just go ahead. I'm going to see if I can get some --

MR. CONWAY: Quite all right, Your Honor. I

don't believe Rule 17 protects us. I believe that -- I believe that until there's a resolution of the Rochester Gas matter one way or the other, a final determination, we would -- our view is that this filing ought to -- ought to move forward in concert with our takings case.

And interestingly enough, when -- when I read the government's reply brief on this area, the government -- the government said that this matter of whether they're going to bring these other claims is unsettled. They say on page 3, if you will, of the Defendant's reply brief, after talking about Rochester Gas, they say, "The issue of whether the government could challenge these assignments is still unsettled." Then they talk -- quote unquote, by the way. They talk about Rochester Gas and what's going to happen in Rochester Gas, and -- so they've conceded that they reserve the right to bring these kinds of claims against us and against the buyer in terms of voiding this entire assignment.

THE COURT: Well, I think there's a difference between voiding an entire assignment and finding that a party has a right to proceed in its own capacity and you could get caught.

MR. CONWAY: Well, I --

THE COURT: The issue isn't -- could not be whether -- whether who is the proper owner but whether there's any owner and then you'd you be out.

MR. CONWAY: That's exactly our --

THE COURT: That's what bothers me.

MR. CONWAY: That's our point, that here we have -- we have -- we have -- claims that no one had -- no one can bring. So that is our -- that is our concern.

I think -- the rest of the arguments on the contract issues I think have been well briefed by both parties. I would -- I would ask the Court to look at Judge Lettow's recent ruling in Boston Edison, his recent ruling in -- in -- and in Systems Fuels, which address essentially the same arguments that we have made here and which the government has made here. In both those cases, Boston Edison and Systems Fuels, similar arguments were made. And particularly in Boston Edison, who I also represent, Your Honor, we made the same kinds of arguments on breach that I'm making here.

THE COURT: And it's as identical as Canal, that last case, isn't it?

MR. CONWAY: I'm sorry?

THE COURT: It's as identical as Canal.

MR. CONWAY: It is.

THE COURT: In other words, if I find Judge Lettow's reasoning more persuasive than Judge Hodges, you take that approach.

MR. CONWAY: I concede the point, Your Honor. I concede that we made the same arguments in front of Judge Hodges in Canal, but only on takings. We did not raise the same arguments, I don't think, with Judge -- with Judge Hodges on breach. We haven't got there yet.

THE COURT: Okay.

MR. CONWAY: But we did raise the same arguments with Judge Lettow on both breach and takings.

THE COURT: How about the implications, if any, I'm talking about recent cases, of the Stearns case and the Chevron case, which is recent, and my utterances in Peanut Quota? Can you address those?

MR. CONWAY: Well --

THE COURT: I thought Peanut Quota was a good decision, but it may not be with us long.

MR. CONWAY: Well, the Stearns case is one that the government cited, so I'm very familiar with that and I read it.

THE COURT: Right.

MR. CONWAY: The Stearns case, except for the fact that it deals with physical taking, has nothing to do with this case. Stearns is a situation where somebody had an easement right in -- for strip mining on a property which they then leased to somebody else; the lessee tried to get a permit -- and I'm making the facts simple -- and tried to get a permit and get a certain designation, which they couldn't get. And rather than -- rather than appeal those permit rights all the way through, the -- the easement owner brought suit on a takings basis, saying that his property had been taken because the easement had now been converted into something else.

And the Court below agreed with the plaintiff and the Court of Appeals reversed and rightly so because -- because all the plaintiff had there was he wanted to get a permit, it was denied; rather than take that process all the way through and have it denied and then bring it up that way, they simply said it was a taking. There was no physical invasion of his property, no third party came on his property, there was no spent nuclear fuel or anything like that put there. It was simply a permit was denied and as a result, he felt well, let's go for a taking.

THE COURT: Your -- your view of this having to hold the spent nuclear fuel, it's not a question in your mind of who has title, your view is that the responsibility for that fuel changed at the breach.

MR. CONWAY: Absolutely.

THE COURT: Then you're having it foisted on you.

MR. CONWAY: Absolutely. And, in fact -- in fact, the government in every case I've been in and in every case I've seen so far makes the title argument. And I thought Judge Braden dealt with it very nicely in -- in Sacramento Municipal Utility District, 61 Fed. Cl. 438, which we cite. And the -- I do not represent Sacramento. And in that case -- that's a July 30, 2004 decision, Your Honor.

In that case, the complainant alleged a physical taking on the grounds that the government's failure to dispose of the spent nuclear fuel had forced SMUD to store it at their Rancho Seco plant.

The government comes back with the same argument that has come here, which is that since the NWPA provides the title to the SNF at issue will not pass to DOE until some time after the commencement of the operation of a permanent repository, there's been no taking, i.e., a physical invasion or occupation of

Rancho Seco.

And Judge Braden points out that's simply incorrect and she says -- and she cites -- she cites a couple of cases and she says on page -- the last page of her opinion, "As SMUD points out in its argument, where the government has forced storage on another's prior property, the just compensation clause is implicated," citing Webbs Fabulous Pharmacies, Inc. v. Beckwith, which is 449 U.S. 156. And I'll summarize, that a state cannot transform private property to public property without just compensation, and also City of Monterey v. Del Monte Dunes at Monterey Ltd., 526 U.S. 687, again paraphrasing, upholding a takings damages where the government engaged in a series of pretextual refusals to allow development over an extended period of time.

And in that case, Judge Braden found that in fact, the plaintiff had made out a good case of taking because although the title was still on the plaintiff, responsibility was for the government, and the government wasn't taking that responsibility, in essence, forcing it to be stored on that property since it can't go any place else. Since this Congress in the -- in 1979, I believe, forbade reprocessing, there's no place to put the spent nuclear fuel except

put it in your -- put it in your spent fuel pond or dry cask storage or Yucca Mountain, and Yucca Mountain is not with us and won't be with us for some substantial period of time.

So either you put it in a spent nuclear fuel pond, which was designed for very limited storage, or you build -- you take an enormous part of your property and build a very expensive dry cask storage and put it there for indefinite storage, or you put it in Yucca Mountain. And I thought Judge Braden dealt with it very, very nicely.

You know, and so we're not saying that title has to pass. That's the government's strawman.

THE COURT: Right.

MR. CONWAY: I think she knocked it down very, very nicely.

THE COURT: What is your view with respect to damages? The government's damages on this?

MR. CONWAY: In the -- on the breach case?

THE COURT: Yes.

MR. CONWAY: They make the same arguments here they made in front of Judge Lettow again, which is that they're speculative and that they are not foreseeable. And I ally myself with Judge Lettow's comments there in his findings, but simply stated,

these damages were definitely foreseeable at the time of formation of the contract in 1983. The NWPA has a specific provision that allow -- that recognizes and allows for the assignment of these contracts, understanding that these -- that these plants could be sold -- I'm sorry, I said contracts -- transfer of these licenses and contracts -- understanding that these plants could be sold within the industry, as they often are, and in fact, the standard contract in Section 14 also recognizes that there can be an assignment of these -- of these contracts and licenses to other parties, recognizing they can be sold.

Now there is a general bar against assignment of contracts and rights and Judge Lettow --

THE COURT: Who is the -- there's a separate statutory provision in this framework.

MR. CONWAY: Which is what Judge Lettow found, that in fact the specific statutory provision overrides the general bar.

THE COURT: Right.

MR. CONWAY: So it was clearly foreseeable. There's no other implication or understanding in 1983 when these contracts were formed other than these plants were going to be sold and we're going to provide for a transfer of licenses and you can assign

these contracts to others when the licenses are transferred. And so, it's -- they were clearly foreseeable at the time of adoption of these contracts.

Are they -- are they reasonable damages? Well, if you have a nuclear plant and you can't transfer your spent nuclear fuel off of it, you implicate a whole variety of things that anyone -- anyone in the industry knew. You have a shortage of life problem because you can't operate if you can't get rid of your fuel in terms of the useful life. If in fact you need more -- more areas to populate with dry cask storage in order to put your spent nuclear fuel there, you can't expand your plant. You can't use the other property where you're putting dry cask storage for other commercial uses.

So, for all those three reasons, it was reasonably understood at the time that if you didn't dispose of the spent nuclear fuel, it would populate your site, reduce the value, cause end-of-life problems, and you couldn't use your other property for other reasons. It's clearly reasonable, clearly understood, and so Judge Lettow found in the -- in the Boston Edison case, and I would -- and those are exactly the same arguments there as we make here.

THE COURT: So it's your view that Judge Lettow's approach, opposed to Judge Hodges' approach, is -- is the better reasoned and the one you'd urge that I follow.

MR. CONWAY: Clearly. And Judge Hodges, who I appeared in front of many times and --

THE COURT: He is an excellent judge. This is just a choice of approaches.

MR. CONWAY: Right. I have high regard for Judge Hodges, but I think -- I think he got it wrong this time. I think he got it wrong for a couple of reasons. We cited the Boston Edison case to him, but I think he -- he essentially -- he essentially ignored it in his ruling. We also cited Sacramento Municipal for the physical taking. We also cited Detroit Edison, 56 --

THE COURT: Which is still alive.

MR. CONWAY: Which is still alive. And how the nuclear interests -- nuclear utility's real property interest taken by the government can proceed in parallel with contract claims. And he ignored all those.

What he -- what Judge Hodges basically did was he grabbed onto Stearns, and he applied Stearns. And I have explained why Stearns doesn't apply here.

I mean, Stearns was correctly decided; it has no application here. And -- and furthermore, Judge Hodges relies very heavily on Commonwealth Edison in -- in terms of -- in terms of arguing that it has to be linked to a contract and if you can't link it to a contract, you have no taking.

Well, the government made the same argument to Judge Hodges and then to Judge Lettow in the Consolidated Edison case, and I also represent Consolidated Edison of New York, about the fact that -- one moment, please, Your Honor -- about the fact that Commonwealth Edison should rule. And I can submit this to the Court if the Court wishes.

In the transcript of that hearing which occurred on May 26, 2005, on page 22, and I have copies to hand up if Your Honor is interested, Mr. Gardner -- Mr. Gardner argued, and I quote on -- on line 13, "And I think to back up a little bit of what would be instructive in this case is to look at cases like Commonwealth Edison, and in that case, Judge Hewitt concluded that even if the plaintiff has a private property interest in its real property, any right to the acceptance of spent nuclear fuel is one driven by contract, and there are no allegations that the remedies, the contractual remedies, were taken in

that case."

Line 22, the Court: "Well, Judge Hewitt decided Commonwealth Edison before the Circuit Court. Federal Circuit decided Cienega Gardens and Chancellor Manor. Let's be honest about it."

His point obviously was that once you had Cienega and Chancellor decided after Commonwealth, the circuit sent back those cases because the circuit determined in essence that you could have both contract and takings cases and he was pointing out that Commonwealth Edison was wrongly decided in light of the Cienega Gardens and Chancellor Manor. Again, I have those if the Court wants to see them.

THE COURT: Thanks, but we've got the cases. I appreciate it.

MR. CONWAY: So, for all those reasons, it was our view that Judge Hodges reached a decision with which we respectfully disagree.

THE COURT: My clerk pointed out for purposes of the transcript that you didn't give the page of the transcript.

MR. CONWAY: Oh, I'm sorry. I thought I said page 22. It is -- the transcript is page 22, and the question starts at -- at Line 9 -- I'm sorry, Mr. Gardner's discussion starts at Line 9, and the Court's

response is at Line 22 on page 22 of the May 26, 2005 transcript. And, again --

THE COURT: Thank you.

MR. CONWAY: -- I can hand these up if the -- I have copies for everybody if you're interested.

So, for those reasons, we believe that Judge Hodges ruled incorrectly on the law.

Secondly, he -- he also chided us in his opinion for not discussing the terms of the Atomic Energy Act and subsequent legislation when in fact that's all over our complaint, as it is in this complaint.

In fact, Judge Lettow, who had very much the same complaint in -- in the Boston Edison case, 64 Fed. Cl. 167 on page 187, points out in the left-hand column that "Boston Edison has argued that the rights taken do not derive" -- and this is in his takings discussion, by the way -- "Boston Edison has argued that the rights taken do not derive from the standard contract but rather from the Atomic Energy Act of 1954, 42 U.S.C. 2011-2297", among other things. And that's correct.

Judge Hodges simply got it -- got it wrong. We did in fact discuss the Atomic Energy Act, and we did point out both in Boston Edison and in Canal where

our rights come from, so I think he got that wrong as well.

The other point -- the other point that I would -- that I would mention is that we cited to this Court and to Judge Hodges numerous cases that indicate when you've got a takings case, you should not dispose of it on motion-to-dismiss except in the highly unlikely situation that you can't find any cause of action.

Now certainly Judge Lettow has found a cause of action for both the contract and takings claims here on virtually the same arguments as we have put in to Judge Hodges. Similarly, in the Court -- Judge Lettow in Systems Fuels found virtually the same arguments that we made here to Judge Hodges, establishing a takings claim, and that's -- and I have the Slip Opinion on that because that's April 20th and that's on page 11 and 12 of the Slip Opinion on Systems Fuels v. U.S., No. 03-2623-C, April 20, 2005.

So these are all recent opinions that have come out from various courts, Judge Braden, Judge Lettow, and others, that indicate the kinds of allegations we're making here are certainly within the mainstream of takings, takings allegations, takings law, and I -- and I didn't mean to interrupt my

discussion of the contract argument to get into Judge Hodges, but since the Court posed the question, I wanted to respond as fully as I could why in our view Judge Hodges' decision was incorrect.

Unless the Court has any other questions on the --

THE COURT: I wanted to ask your preferences as well, if the case proceeds on one or both claims, what's your view as to whether the proceeding should await any determination in PSEG, and if they should not await, how you see the case proceeding.

MR. CONWAY: I don't think we should wait for PSEG. We've had this issue -- the government has raised this issue of consolidation in a bunch of cases. Alex Tomaszcuk and I happen to be buyer and seller, I represent seller, he represents buyer, and Alex and I have discussed this, he's counsel, for example, of Entergy, in a number of cases. And we both strongly oppose consolidation.

My cases are much smaller. The cases I represent are smaller, more streamline; his cases have much more profound issues in terms of rate of acceptance. Is it 900 tons, 3000, greater than Class C waste, those kinds of issues. And he needs time to put together a variety of proofs. I don't need as

much time as he does. For example, in terms of --

THE COURT: What about, though, the government's concerns of a possible double recovery? How would you handle that?

MR. CONWAY: Well, we discussed that in both Con Ed and Boston Edison, but my -- our approach is -- excuse me, our approach is -- and we suggested this to Judge Lettow -- during the course of discovery, we will provide at the appropriate point a listing of our claims and where they come from, and the buyer will do the same, and at that point, if you see any overlap, then you can say well, there's some overlap. But right now, the government is raising the specter of overlap without any indication that there is overlap. Okay? They're saying -- they're giving you a parade of horribles, as they've done to every other judge we've dealt with, this could happen, that could happen, we should be consolidated.

We don't want to be consolidated because our case, we want to -- for example, Judge Lettow indicates that he might take our case in the summer or fall of '06, and -- and the buyer's counsel does not want to move to trial until a year later for reasons having to do with the way their case is structured.

We could take our claim analysis, provide it

to the government, get the buyer's claim analysis to the extent they have one, see if there's an overlap. If there is, address it at that point. But why consolidate these cases because of a fear of overlap when you don't have any indication there's an overlap?

THE COURT: That's valid. So let's assume, if we are going ahead on one or both, it wouldn't matter, the schedule would be the same, what's your preference? Is your preference that the parties get together and come up with a course of further proceedings and a schedule of deadlines and proposed trial dates?

MR. CONWAY: Absolutely. That's absolutely our desire. We would like to --

THE COURT: You're going to be in trial next summer?

MR. CONWAY: Judge Lettow hasn't set it, hasn't set the trial. He's looking at either the summer or the early fall. He said two weeks ago that he had a hole in his schedule in the early fall. I asked -- I said I wanted to go to trial in the spring of '06. He said --

THE COURT: Are you ready in this case for the spring of '06?

MR. CONWAY: If I can get some discovery.

THE COURT: I mean, I don't know which case is going to --

MR. CONWAY: Yes. If I can get some -- if I can get discovery going, yes, I'll be ready. I can be ready in the spring of '06, yes.

THE COURT: Do you want to try this case in the spring of '06?

MR. CONWAY: Yes. My client nods yes.

THE COURT: I've got a hole.

MR. CONWAY: My client nods yes, I nod yes. Yes, Your Honor. We're prepared to go. I just want to move these cases along quickly and get them done. I mean, we put the affidavit of Mr. Shaw in, in a very detailed affidavit, although the government put no affidavits in and no real factual issues, we put -- we put in in our response to proposed findings of fact where we disagree with them substantially on the factual issues. We dispute substantial facts with them, as we pointed out there.

We also put in Mr. Shaw's affidavit to show why and how we had understandings on -- on what the expected value of our plant was, what the status of the industry was, how we had a diminution of value, where it came from, comparing and contrasting it with fossil fuels. Mr. Shaw was in the middle of all that.

So I think our case can be ready to go. I do.

THE COURT: Now one thing that I did find a gap in the summary judgment papers was Plaintiffs' assertion about the amount of fees that were paid and evidence to support your assertion that they were paid.

MR. CONWAY: Oh, well, first of all, Mr. Shaw, if you're talking about fees into the Nuclear Waste Fund?

THE COURT: Yes.

MR. CONWAY: Mr. Shaw addresses that in his affidavit, and I will -- at least initially addresses it in his affidavit in our appendix. And it is -- it is on his affidavit, Your Honor -- if you'll give me a moment, I -- I will find it for you. Ah, paragraph 5. He says, "Based upon my review of the company's records, Delmarva and Atlantic paid in excess of 7.6 million and 7.9 million in fees respectively to the Nuclear Waste Fund as part of the nuclear stations."

Now I should -- to be clear with the Court, we think, but we haven't been able to establish, those numbers are substantially low, and the problem is that when my client sold the plant, the books and records went along with it to the buyer, and so a lot of those books and records are with the buyer, and when we put

the affidavit together, we didn't have -- we didn't have the benefit of a lot of those books and records, but the books and records we did have show a minimum of 7.6 and 7.9 respectively in fees, so, I mean, those are substantial numbers by themselves. This is the affidavit of Mr. Shaw.

THE COURT: Okay.

MR. CONWAY: There has been some confusion by the government over what of our -- what property interests we're asserting here for takings. And I think -- I think -- I think we try and be fairly clear in our brief that we have -- on page 26 of our brief, that we have three separate property interests, and we list them at the top. They are first our real property interest, namely, the property that must be employed to provide storage of the SNF for which the government was otherwise responsible; two, Delmarva and Atlantic's assets associated with the nuclear stations, that is, the stations that were not -- that are personal property as opposed to real property; and, third, the value of the nuclear stations as a going concern, i.e., the ability of Delmarva and Atlantic to use and enjoy the benefit from these stations unencumbered by the amount of liabilities associated with interim SNF storage and any

uncertain -- the costs and uncertainties of permanent disposal.

And we cite a variety of cases: Sacramento Municipal, Detroit Edison, Loretto v. Teleprompter, et cetera, et cetera, et cetera.

THE COURT: I think as I read your papers, you are agreeing that your rights cannot emanate from the contracts themselves.

MR. CONWAY: Our property rights do not emanate from the contract.

THE COURT: Right.

MR. CONWAY: They emanate from these three property interests I'm describing.

THE COURT: And you're not arguing that they emanate from the contract.

MR. CONWAY: We are not. We are not. And that's --

THE COURT: I mean, I -- I mean, that's -- that's what I decided --

MR. CONWAY: Right.

THE COURT: -- in Detroit Edison, you can't go further, but -- and I think those interests have not specifically been addressed.

MR. CONWAY: Correct. And those are the three interests we talked about here. And we do -- we

do indicate where those property interests are three different kinds of property interests. We do indicate why they are compensable property interests and recognized property interests. And the real --

THE COURT: And you would endorse the viewpoint taken by Judge Braden as to the burden on those interests, the nature of the burden that's been put on those interests?

MR. CONWAY: You mean burden of proof, or --

THE COURT: No, the burden -- the burden à la invasion or --

MR. CONWAY: Oh, yes, absolutely. Yes, absolutely. I would endorse what Judge Braden had to say about that. But I wanted to clear that confusion up. Let me see if there's any other comments I would like -- I need to address for the Court.

One interesting point, and it came up a little bit in counsel for the government's argument, the government has -- has already paid Exelon some $80 million to settle their side of the case.

THE COURT: That's why we thought we might be able to settle a part of this case --

MR. CONWAY: As -- and we tried --

THE COURT: -- and we wasted time.

MR. CONWAY: And we tried hard to do it.

They paid 80 -- by the way, that $80 million is a down payment, Your Honor. It's for four years, as I'm sure Your Honor is aware, because the settlement agreement has been made public. It's for four years. The industry press views that settlement agreement as worth some $300 million or more. I'm sure the government disagrees, but there's no disagreement that they had a settlement, signed a settlement agreement, it's been made public, they paid $80 million. We calculate of that $80 million 56 is for the plants where we -- that we sold, Peach Bottom, and that's just for a four-year period, and it continues to ratchet up and up and up and up and up.

It is interesting that the government paid those costs to Exelon after our cases had been filed and -- and view that we have absolutely no rights here.

In sum, Your Honor, I think our brief stands for itself, but I would -- I would ask the Court to focus on Sacramento Municipal, Boston Edison, Systems Fuels, those significant cases as well as the comments I've made here today.

The final point I would make is that -- and this is not in our brief -- a decision came down recently from -- from the Supreme Court, Kelo et al.

v. City of New London. It is -- it is a takings case. It was decided June 23, 2005, No. --

THE COURT: Last Friday?

MR. CONWAY: 04-108. Yes. Yes. This is the infamous case about -- about development in the City of New London and the fact that the city used its takings power.

THE COURT: No, I'm very -- I'm very familiar with it.

MR. CONWAY: Okay. Well, as the Court is aware then, the court wrote in very expansive terms in that case about the takings power and the takings right and the broad -- how it must be broadly interpreted and broadly understood and broadly implemented. And -- and they put --

THE COURT: Unless you want to assert a taking, of course.

MR. CONWAY: I'm sorry?

THE COURT: Unless you want to assert a taking, of course.

MR. CONWAY: Well, if you --

THE COURT: I'm being facetious. Unless you want to -- unless you want to assert your rights vis-à-vis such a taking.

MR. CONWAY: Oh, well, yes. If you're on

the other side of the case, yes. Well, the people on the other side of the case had their homes, they had been there for a long time and generations before them, and they -- and they -- they unfortunately did not prevail. However, the fact that on one side of the -- of this algebraic equation you have Kelo saying you've got broad rights, broad usage, interpreted broadly, must stand for the proposition that on the other side of it you had broad rights when there's a taking to assert a taking to get just compensation for that.

And I think that properly understood in the context of our case, Kelo is powerful evidence that -- that our case should not be -- should not be resolved or dismissed, particularly when there is such profound factual disputes as we have pointed out in our response to the government's proposed findings of fact.

Thank you, Your Honor.

THE COURT: Thank you very much, Mr. Conway.

Mr. Ekman?

MR. EKMAN: Thank you, Your Honor.

I was frantically scribbling down some notes, so let me try to --

THE COURT: Oh, I saw you. You were busy.

MR. EKMAN: -- make -- make sense of my chicken scratch.

First of all, I guess I'll begin where he ended, where Mr. Conway ended, with the Kelo decision. I actually read that decision because I was interested in the fact that, you know, I was about to have a takings argument. I don't see that that case has any application to the issues here.

THE COURT: It doesn't. It's just called a atmospheric, and it's -- I'd put it this way. It's a cautionary one because an argument that might make a certain segment of the takings oriented part of the government happy can get a bite when you get the claims coming in as a result of it.

MR. EKMAN: And really what that case was about was about what the government can do, not necessarily about --

THE COURT: I know. That's rather awesome, isn't it?

MR. EKMAN: -- about -- it is. But it's not about the remedies and I don't think that Kelo had any impact on the longstanding case law here.

THE COURT: Well, it had none at all except people are going to be seeking remedies for what -- what occurred, and that's that will indeed happen.

No, it's just -- it's an atmospheric. You know, it was a historical moment in the Court.

MR. EKMAN: I don't disagree, but I did want to address it because I did review that case.

The issue of Exelon, we may have settled Exelon after this case was filed but not before the breach of contract claim was filed. As Your Honor knows, that happened December 2nd of last year.

In addition, it's worth noting that although there's an obligation to do this in the rules, there was no notice of related cases filed when -- when either the Atlantic City or Delmarva case were filed, so I'm not sure that there's -- you know, the implication is that we somehow had notice and so to the extent we wind up double paying, that it's appropriate, well, we didn't.

THE COURT: Oh. Oh, no. There's no implication that there would be any double payment. Whoever recovers, there will be adjustments made to make sure that, you know, if there is any recovery that it doesn't constitute a double payment. That is not what should be worrying the government.

MR. EKMAN: Thank you, Your Honor.

Now I do want to address since, again, the issue of double payment came up, there's -- there were

a couple comments made about PSEG. I mean, it's important to note that in this case, a significant amount of the discovery that the government is going to need to take is going to come from PSEG. You know, it is alleged here that PSEG paid a diminished sum for the Plaintiffs' interest in those facilities. PSEG is going to be a necessary party and is going to be heavily involved in discovery.

THE COURT: Well, I'm hoping if Plaintiff wants to move forward and has a congenial relationship with counsel for PSEG who is a frequent practitioner in the Court and is a highly regarded individual that there will be arrangements made to try to facilitate discovery that will give you what you want but within limitations that are appropriate to this case.

MR. EKMAN: Well, and, you know, again, the issue here is, you know, if PSEG has been compensated by paying a diminished value for the asset, you know, paying them then for future storage costs and compensating these Defendants will result in a double payment by the government. That's -- that's what will happen. And obviously, you know, and I appreciate the Court's statements, but, you know, obviously we are concerned about that.

THE COURT: Yes. We'll be -- we will be

working to that end because apparently the last thing both counsel want in the cases is to encumber each other's case, so they'll be responsible for working out some form that allows extrication of the respective cases without creating the sort of overlap that would trouble the government, because otherwise, the cases are going to have to meet on a common ground before the same judge.

MR. EKMAN: And I do want to address -- and obviously that may be an issue we have to address as we talk about scheduling. I would note -- and Mr. Conway has said this a few times, that this is a smaller case, it's more streamlined. In the government's opinion, that's not true. In examining these cases, issues like the rate of acceptance are relevant. You know, what our obligations are to these Plaintiffs and to these facilities is relevant for determining whether a taking occurred, when a taking occurred if it occurred at all -- and, again, we don't believe any taking has occurred -- what damages that they're seeking.

THE COURT: If the case -- yes. If -- if the case proceeds past the summary judgment stage in whole or part, the parties would be required to give a proposed schedule. To the extent they have different

views, we'd thrash them out at that time.

MR. EKMAN: And I just want to note, I mean, we believe it is a complicated case. Obviously, this is going to be heavy, heavy into experts --

THE COURT: Some of these cases have been tried.

MR. EKMAN: That's correct.

THE COURT: Okay. Mr. Conway, have you tried any yet? Of the cases that you regard as less complicated?

MR. CONWAY: I beg your pardon, Your Honor?

THE COURT: Have you tried any yet? I'm -- I truly --

MR. CONWAY: Of the spent nuclear fuel cases?

THE COURT: Mm-hmm.

MR. CONWAY: No. We've been wrapped up in dispositive motions for a year and a half.

THE COURT: Okay.

MR. EKMAN: I've tried two of them --

THE COURT: Right.

MR. EKMAN: -- and, you know, those cases are complicated also, but -- but --

THE COURT: I didn't know -- I was trying to get an order of magnitude, whether they represented

the more complicated or less complicated or if we could put any characterization on it.

MR. EKMAN: Well, I think that the characterization, without having -- you know, obviously, we don't have, you know, a claim in this case, but, you know, without -- I think that they are of equal complexity. The -- the issues -- many of the same issues are going to be implicated in this case that have been implicated in others and those do include the rate of acceptance. Plaintiffs say it's not involved. We believe the rate of acceptance is going to be involved in this case and that this case is going to be a complicated case. I just want to make that -- that clear, that it's not simple.

THE COURT: At the proper time, we'll have to just straighten out what's required to develop the case for trial and when it can be tried.

MR. EKMAN: Great. Thank you.

THE COURT: I'm always optimistic when somebody is talking in terms of less than a year because I think it's a rare case that, at least at this point, after full briefing on summary judgment, that can't be ready for trial within a reasonable period of time. And a year is on the outer bounds of reasonableness.

MR. EKMAN: And we obviously, you know -- the government obviously wants to -- and, again, we can talk about that to the extent that this claim is allowed to proceed. You know, obviously, we're also concerned about trying to make sure that our cases are running, you know, -- fitting somewhere so we're not running multiple trials simultaneously.

THE COURT: Well, I -- that's one of the problems that happens, and as you know, in Winstar, the government's required to go out and get other attorneys to help them and I've found that once that starts, it's inexhaustible and you have resources, you have to allocate them, but I, you know, would hope the parties could agree on a timeframe.

If -- I would -- this is what I think. Some or all of these cases are probably going to go froward. Some of it may fall by the wayside as we proceed. I am ready in the spring of next year, and I'd want to know good reasons why everybody else isn't. And because I think that's a -- that's a timeframe that's open, let's use it. But if you -- you know, if everybody that you've got possibly allocated to these cases is up against the wall, you have to let us know, and I'll accommodate you. But understood that, you know, it isn't Plaintiffs' fault

that there are numerous groups of attorneys in many cases. Their needs reasonably have to be addressed. I don't have any other SNF cases.

MR. EKMAN: I appreciate -- yes. No, I understand that, and we'll certainly address that in a future proceeding or status report if it's needed.

In terms of Judge Hodges, I would like to say I think that the notion that Judge Hodges relied on Commonwealth Edison simplifies what I think is an excellent order. I mean, Judge Hodges relied upon Castle, he relied upon the decisions of the Federal Circuit. He noted the decision in Commonwealth Edison. And I think one of the differences between the government's positions in this case from a legal perspective and the Plaintiffs', and I heard this in oral argument today, the Plaintiffs rely heavily upon decisions, some decisions, a few of the decisions, in other spent nuclear fuel cases, ignoring as much as possible precedent from the Federal Circuit and the Supreme Court and ignoring, of course, Commonwealth Edison, Southern Nuclear, and Canal, all of which have dismissed identical takings claims, so --

THE COURT: Well, I really felt that both Judges Lettow and Braden gave proper due to the Federal Circuit and the Supreme Court. It just -- and

not surprisingly, there are different cases that one can rely on because nothing has addressed this issue in precisely these terms. I think all these cases do give guidance, and my anecdotally sharing with you the oral argument and yet-to-be-seen decision in Peanut Quota shows you that we're in a constant state of evolution. There was a case that was four-square, 100 percent for the government based on absolutely solid precedent, and we may be looking at that again.

So, you know, this is not a case that involves bright lines. One of the reasons -- and when we move into the Penn Central type of cases, any kind of taking, the Federal Circuit if it said nothing else since Yuba consistently, it's found error in grants of summary judgment. When -- when anything could look factual, they -- they really want us to err on that side. That doesn't mean that I wouldn't be attune at all times to jurisprudence that isn't coming -- that's coming out from the Federal Circuit because we could be proceeding on our way and have the legs cut out, which is fine as long as we all agree that just what the Federal Circuit did would stop it. But we don't have that level of guidance at present.

I do not think this is open and shut in any respect. I think it's very good that Judge Hodges

took his take because it gave ballast to the -- the other two approaches. I -- my own review is that Judges Lettow and Braden make an analysis that should have some consideration until we get clearer guidance, which I don't think we have at present, but these cases are moving up and back and we may learn something in the interim.

MR. EKMAN: I would also, again -- a few other comments that I wrote down. Mr. Conway disavowed any -- any reliance upon the standard contract, but, again, the problem with that is it begs the question if Plaintiffs' right to acceptance doesn't emanate from the standard contract, then where does it emanate from? And, again, that takes us back to my discussion about the statutes. There's no obligation under the Nuclear Waste Policy Act for the Department of Energy to accept any spent nuclear fuel at any particular time; simply, it authorizes us to enter -- it authorizes the Secretary to enter into contracts, and it's those contracts that are enforceable. So I still think that we haven't heard --

THE COURT: Well, I don't know if you'd call them succinct because there are three of them, but they -- they were able to put them in one sentence,

and -- and I really think they've characterized their property interests a little differently than you have, and I think they fall in line with the Braden analysis.

You know, it's basically the burden on the property that is being required to bear the -- the storage.

MR. EKMAN: And the reason -- and I guess that then that -- again, that takes that second argument, what's the action, and the action that burdened the property is allegedly a breach of a contract, not a violation of a statute. I mean, the Plaintiffs talk about -- again, something else that was brought up is the -- President Carter's ban on reprocessing in the 1970s. Plaintiffs mention a FERC decision in the late 1990s. You know, they mention --

THE COURT: Well, that's all -- that's all history, but the point is the government has the power to require the burden. The government did require the burden. In the process and as another cause of action, they breached a contract, but Plaintiffs' rights in terms of running its property, its plants, other than under federal license, are, you know -- are the kinds of property interests that are recognized. What is not a cognizable property interest is a right

to a license, for example.

By nature, this is a heavily regulated industry, but this is the imposition of a burden by fiat that is not part of the regulatory process, and Plaintiff believes that it gets its rights to be free of this kind of burden because it is operating according to law and can employ its property in any way that it sees fit according to law without having the government increase its obligation.

So whether or not you say oh, the statute did it or the breach of contract did it, we're not looking at what did it, we're looking at what was done and that the end result is to have this unique kind of burden. And if Plaintiff did not have these property interests to begin with, i.e., its own property, you'd be -- you know, you'd be absolutely right, but it did. It owned its physical plant, it owned its storage facilities and it's being tasked to do the government's work because the government told them it had to.

And it sounds very much like it some day may be a very, from the government's point of view, a happy extension of the Kelo case; from others' points of view, not so happy, that the government can do something like that. It's basically saying somebody

has got to bear this burden, it's profitable for us that you burden it. The government will turn its attention to going out in Nevada and having a decades-long proceeding to make sure that the solution that was adopted 20 years ago was the correct one.

I mean, if the sheer brainpower that you and Mr. Lester are bringing to bear on these cases was allocated to informing the zions on Capitol Hill, I would be delighted, but I guess that isn't how we choose to allocate our interests, which is too bad.

So I see the landscape here. I was -- when I read Judge Lettow's recent decision, we were working on our case, and I said -- and it's rare this occurs, that another judge has had the opportunity to address a very similar situation and especially on an interim basis and that's all this kind of ruling is. I think more or less he canvassed that field and in a different way admittedly than Judge Hodges, so I was happy when I saw his decision because it allowed me to look at it a different way.

And I believe at this interim stage the Judge Lettow approach is the sounder. I also want to emphasize that this law is evolving, and under Rule 56, of course, any decision that is made, you know, is subject to revisiting as we go along, and,

you know, I want to be made aware of any developments that impact what we're doing. But I really think at this point, especially after wasting time on settlement, I want to get the case in a posture where it's moving somewhere, and I'm not going to cut it off now. I don't -- I don't think I really could without going through Judge Lettow and Judge Braden's opinion and thoroughly disagreeing with them and I really as a matter of legal scholarship cannot do that. But that doesn't disrespect your arguments; we look at them later. You know, I mean, they -- nothing is lost until the proverbial fat lady, you know, has the aria at the end of trial.

And I just issued a very lengthy opinion in a contract case where it memorialized summary judgment rulings, you know, that were made a long time before and revisited some of the rulings that had become alive again in trial, and, you know, these things occur.

So nothing -- the only thing that's won here is that there is life in the -- these claims. And I -- -- and if the government would get a consistent position on the contract claim, we could simplify our focus here, and I think you should go do it. That would remove a whole area, and I think that Plaintiff

is willing -- Plaintiffs are willing to have it removed, and you are encouraged to do it. And -- and then I'll be the first person who is apprised of any problems that you have with not being able to get the case in shape for early May.

I'm going to ask -- what I'm going to do is ask the parties probably to work with that timeframe and see what -- what you can do. And, you know, I don't want to jump ahead of anybody who has your commitments at all, but to the extent that there are trial teams involved here, I expect them to be manned.

Now I think that's all we can do today. I'm going to look over your arguments carefully again, and I really -- I really appreciate them. The government has some very strong arguments, but it's keeping too many balls in the air. And, you know, these -- I know the government has tried for a long time to get these cases under better management and I have tried myself to see that that's done, I have failed, so we'll just deal with them one by one.

That's the best I personally as a judge can offer, and I'm sorry that we don't have a more systemized way. I think it would help everyone, but I -- I can't seem to get support in that regard.

So the next step is we'll review everything

to make sure that we're headed in the right direction. We'll get an order. It will ask in turn for a cooperative response. I hope you'll be able to agree. I'd like to have us start thinking in terms of spring 2006. And spring 2005 is just over, technically.

Anything else I should be aware of before we conclude today?

MR. EKMAN: No, Your Honor.

THE COURT: Well, thank every -- Mr. Conway?

MR. CONWAY: Nothing from me, Your Honor.

THE COURT: Thank everybody very much, especially for putting up with this sauna. I was going to give out before you guys did.

Thanks again and see you soon.

MR. CONWAY: Thank you, Your Honor.

MR. EKMAN: Thank you, Your Honor.

(Whereupon, at 3:18 p.m., the proceedings in the above-captioned matter were concluded.)

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NOS.: 04-34C & 04-36C

CASE TITLE: Delmarva Power & Light/Atlantic City Electric v. United States

HEARING DATE: June 28, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 6/28/05

Megan Stein

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N. W.

Washington, D. C. 20005-4018